UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERCIA,          . Criminal No. 13-MJ-280
                                   .
            Vs.                    .
                                   . 824 Federal Plaza
                                   . Central Islip, NY
GERSHON BARKANY,                   .
                                   . DATE: March 28, 2013
                                   .
. . . . . . . . . . . . . . .


TRANSCRIPT OF HEARING
BEFORE HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES DISTRICT MAGISTRATE


APPEARANCES:


For USA:                    UNITED STATES ATTORNEYS OFFICE
                            EASTERN DISTRICT OF NEW YORK
                            BY: CHRISTOPHER C. CAFFARONE, ESQ.
                            610 Federal Plaza
                            Central Islip, NY  11722


For Defendant:              BARKET MARION EPSTEIN & KEARON
                            BY:  BRUCE A. BARKET, ESQ.
                            666 Old Country Road
                            Suite 700
                            Garden City,  NY  11530


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

**TERRY GRIBBEN'S TRANSCRIPTION SERVICE**
**27 Beach Road, Unit 4**
**Monmouth Beach, NJ  07750**
**(732) 263-0044     Fax No. 732-263-0075**
**800 603-6212**
**www.tgribbentranscription.com**

                           Colloquy                          2

1              THE CLERK:  Calling Magistrate case, 13-280, United

2     States of America versus Gershon Barkany.  Please state your

3     appearance for the record.

4              MR. CAFFARONE:  Chris Caffarone for the Unites

5     States.  Good afternoon, Your Honor.

6              THE COURT:  Good afternoon.

7              MR. BARKET:  Good afternoon, Your Honor, Bruce

8     Barket, for Mr. Barkany.

9              THE COURT:  Good afternoon.  I'd ask you to remain

10    seated, we don't have a court reporter as you can see, so it's

11    important that we have a record here.  And the only way I can

12    guarantee that clearly is if you're on top of that microphone.

13             All right, Mr. Barkany, are you read to proceed?

14             THE DEFENDANT:  yes, Your Honor.

15             THE COURT:  You are Gershon Barkany, is that correct?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  Mr. Barkany, the purpose of this

18    proceeding, is to make sure that you understand what crimes

19    you're charged with to make sure you understand you have a

20    right to be represented by an attorney, and to address the

21    question of whether you should be released on bail or held in

22    jail.  You are not required to make any statement here.  Any

23    statement that you do make, except to your attorney, Mr.

24    Barket, can be used against you, do you understand that?

25             THE DEFENDANT:  Yes, Your Honor.

Colloquy                                    3

1    THE COURT:  Mr. Barkany, have you had a chance to

2    review the complaint and affidavit in support of the arrest

3    warrant that's been filed against you in this case?

4        THE DEFENDANT:  Yes.

5        THE COURT:  And do you understand that you've been

6    charged with on or about June 14th 2010 within the Eastern

7    District of New York and elsewhere, of knowingly and

8    intentionally devising a scheme and artifice to defraud

9    investors and to obtain money and property from those investors

10   by means of materially false and fraudulent pretenses,

11   representations and promises.  And for the purpose of executing

12   such scheme and artifice, you've transmitted and caused to be

13   transmitted writings, signs, signals, and sounds by means of

14   wire communication in interstate and foreign commerce.  Here

15   specifically a wire transfer in the amount of $13 million,

16   contrary to Title 18 Section 1343.  Do you understand that

17   that's what you're charged with?

18       THE DEFENDANT:  Yes.

19       THE COURT:  Mr. Barket, have you had an opportunity

20   to review the complaint with your client?

21       MR. BARKET:  Yes.

22       THE COURT:  And have you explained to him his

23   constitutional rights?

24       MR. BARKET:  Yes.

25       THE COURT:  What's the Government's position here

Colloquy                                    4

1   with respect to the issue of detention or bail?

2          MR. CAFFARONE:  Yes, Your Honor, the Government asked

3   for a permanent order of detention to be entered.  The

4   Government's position is that the defendant presented flight

5   risk.  The defendant, as stated in the pretrial report, is the

6   owner of Pratt Park Group which have offices in Cedarhurst in

7   Nassau County.  He was engaged in a massive fraud that

8   defrauded people of tens of millions of dollars.  He also has

9   ties to foreign countries as we laid out in both the detention

10  letter and laid out in the pretrial report, specifically he has

11  parents that live in Canada.  He's visited them frequently over

12  the years.  He has two siblings in Israel that he's visited on

13  a number of occasions.

14         In addition, in the complaint there was a reference

15  to money being sent over to Israel to purchase property without

16  investors' knowledge.  In addition to the tremendous amount of

17  fraud here, the ties to foreign counties, the strength of the

18  evidence is considerable.  He confessed to one of his investor

19  victims in the presence of others.  He signed a notarized

20  affidavit where he confessed to this, all these real estate

21  deals being fabricated and fraudulent.

22         And the amount of jail time he's looking at is

23  significant.  It creates a tremendous incentive for him to

24  flee.  He's looking at a maximum on this one count of 20 years.

25  The sentencing guidelines range I've estimated in this case to

1   be approximately 108 to 135 months in prison.  That's a

2   significant, significant sentence here.  And we believe that

3   that presents a, all of those factors when considered, present

4   a risk of flight.  And we'd ask that a permanent order of

5   detention be entered at this time.

6           THE COURT:  All right.  First of all, Mr. Barket,

7   have you reviewed the detention letter that the Government

8   submitted?

9           MR. BARKET:  Yes, Your Honor.

10          THE COURT:  All right, do you wish to be heard?

11          MR. BARKET:  Briefly, at this point, Your Honor.

12  I've spoken to the Government at length to try and reach some

13  agreement with respect to a bail package.  We're not going to

14  be able to reach an agreement today.  At this point in time,

15  the only bail package we could put forward was his father-in-

16  law is willing to put up his house, and sign a bond for a

17  million dollars.  He's in the courtroom today.

18          I would point out to Your Honor that these

19  allegations date back several years.  And the very things that

20  the Government argues or uses to argue for detention, that he

21  signed an affidavit, that he confessed to a number of people,

22  indicate, I think, strongly, that he's not a flight risk.

23  These charges and these acts took place several years ago, when

24  he had access to significant funds.  Instead of fleeing with

25  those funds, he met with the investors, signed an affidavit and

Colloquy                                    6

1  a confession of judgment, and has been trying to return or

2  repay the money over the course of time.

3          There's no indication that he had fled or tried to

4  flee, or made plans to flee in the last few years when he

5  obviously had the opportunity to do so.  So I would argue the

6  chances of flight at this point are not any greater than they

7  were, or not much greater than they were while he was signing

8  affidavits.  And if the million dollars from his father-in-law

9  is sufficient to insure his appearance in court, if those

10 conditions are not satisfactory, we will obviously look to

11 renew this after we've had some time to speak to other family

12 members.

13         Unfortunately, this came in the middle of a holiday,

14 for my client it's the middle of Passover.  So Monday and

15 Tuesday they can do nothing of next week.  The only day that we

16 can actually really do work here on this case with his family

17 is tomorrow, and it's the beginning of the Sabbath. And it's

18 obviously Good Friday for others.

19         So I think the million dollar bond at this stage is

20 sufficient.  And we can return on the Wednesday or Thursday

21 with further sureties.

22         THE COURT:  Anything else?

23         MR. CAFFARONE:  Your Honor, the only thing I would

24 note is that the, while the defendant may have, he had, he did

25 confess to the investor victim and signed the affidavit, he was

1  not aware that the Government was investigating him.  So the

2  flight risk, you know, he wasn't aware that the FBI was

3  investigating him until he was arrested today.  So I'd argue

4  that the fact that it was a little older does not rebut the

5  flight risk that's presented by the tens of millions of dollars

6  of loss by the severe criminal penalties that he's facing.  So

7  that's the only thing I'd add, Your Honor.

8               THE COURT:  All right.

9               MR. BARKET:  Judge, I'm sorry, actually my client

10  indicates that he did know that the FBI was looking at him.

11  That he understood that Agent Hagerty (phonetic) had been

12  googling his name about a year ago or a number of months ago.

13  And we won't go in circles, but if someone's inclined to flee

14  with a large sum of money, the last thing that they would do is

15  sign confessions of judgment, agree to pay it back and stick

16  around for several years.

17               I'm sorry, one, I didn't note anything.  He lives

18  locally with his wife, they life in Woodmere.  They have a

19  three year old son and his wife is six months pregnant now.

20  The entire family, he was arrested in Stamford because the

21  entire family went to a hotel in Stamford to celebrate Passover

22  together.  It was an event that was sponsored by an

23  organization.  That's where most of his family still is today.

24               THE COURT:  Well, let me just ask a couple of things.

25  First of all, and don't read anything into this, please, what

Colloquy                                        8

1    you're proposing in terms of the, is this the father-in-law?

2                MR. BARKET:  Yes.

3                THE COURT:  And this is property to support a bond,

4    to secure a bond?

5                MR. BARKET:  He has property and assets to support a

6    bond, yes.

7                THE COURT:  All right, what are we talking about,

8    realistically?

9                MR. BARKET:  The family home is worth, his family

10   home in Rockland is worth 300,000, and his wife also has assets

11   in a business interest that are worth several million dollars.

12               THE COURT:  Well, that's not going to take care of

13   things today, that I can assure you.  But let me go through

14   what I need to go through.

15               I've gone through the Government's application here

16   very carefully and looked at the cases that the Government

17   cited in its letter regarding bail.  In terms of this case in

18   particular, just as in any other case, my obligation is to look

19   at the factors under 18 USC Section 3142(g) to make a

20   determination in this instance, for example, a number of

21   factors.  But in particular I'm required to look at whether or

22   not the Government's established by clear and convincing

23   evidence that this individual is a fight risk.

24               Looking to that, the Government makes a strong case

25   with regard to this particular defendant's ties outside the

Colloquy                    9

country, both in Canada and in Israel.  The Government drew my

attention to a case which actually is somewhat helpful here in

terms of looking at the factors and just for comparative

purposes, I'm looking specifically now at United States versus

Londono-villa which is 898 F. 2nd 328.  It's a Second Circuit

1990 case.

          The reason I found this somewhat helpful is, it

actually sets up a good contrast in a number of these factors

between that case and the allegations in this case.  Let me

just talk about Londono-villa for a moment.  In that instance,

the release that was granted on bail was after a conviction and

pending sentencing which is clearly different from the

circumstances that we have here.  And Judge Leisure released

the defendant on bail.  The conviction itself was for importing

150 kilograms of cocaine and aiding and abetting another 111

kilograms from Medellin in Columbia.  Judge Leisure said there

were substantial questions of law or fact to be raised on

appeal, and he found by clear and convincing evidence that the

defendant was no longer a flight risk at that point in time,

part of which had to do with his assessment of the number of

letters that came to him from character witnesses and plus

other events that had gone on in the case.

          The bail in that case was set at $1 million.  Now

keep in mind, this is 1989 the bail was set at $1 million.  It

was secured by property.  In addition to that, the defendant

                              Colloquy                        10

1   surrendered his passports. He also executed a waiver of

2   extradition as part of the bail package.  The Court, this is

3   Judge Leisure again, relied to a degree on the demeanor and

4   credibility of the family members who actually testified during

5   the trial.  Interestingly, when the bail issue was appealed to

6   the Second Circuit, the Second Circuit reversed the finding

7   that this individual was eligible for bail.

8            Significantly, it was a two to one decision with

9   Judge Newman dissenting.  And Judge Oakes and Judge Walker in

10  the majority.  In that instance, and part of the reason that

11  the Court reversed was they noted that the potential guideline

12  range in that case at that time was 292 to 365 months, which

13  the Court said provided a powerful incentive to flee that

14  didn't exist pretrial.  Again, we're in a different stage here.

15           The defendant in that case was a 29 year old

16  commercial pilot for Avianca, who was familiar with clandestine

17  foreign airstrips, according to the Court.  And there was

18  evidence in fact that he's flown to one of those airstrips in

19  Columbia with another pilot.  The Court went on to note he had

20  few ties to the community.  That he and his wife had

21  substantial financial resources.  And that the money at stake

22  in the drug business dwarfed the amount of equity in the house,

23  which was in excess of $1 million that actually was posted for

24  the bond there.

25           The Court estimated only one substantive issue for

1    appeal.  As I indicated, Judge Newman dissented there and

2    stated that he agreed that the defendant probably was a flight

3    risk.  But his dissent was built on the fact that he believed

4    that the Court's conclusion that the demanding conditions of

5    bail that had been set by Leisure in fact sufficed to assure

6    that the defendant was not a risk to flee.  And he called the

7    clearly erroneous finding by his colleagues to be regrettable

8    noting that "such evenhandedness in reviewing bail findings is

9    one of the early casualties of the war on drugs".

10   Interestingly, that defendant's conviction was ultimately

11   reversed on appeal in the Second Circuit in 1991.

12            So looking at the factors that I am required to look

13   at here, the history and characteristics of this defendant, the

14   strength of the Government's case, having gone through the

15   pretrial services report, and heard what I've heard here today,

16   I see that this defendant, Mr. Barkany, is 29 years old, he's a

17   naturalized United State citizen.  He lived in Canada until

18   2001.  He has ties to Canada and Israel as the Government's

19   pointed out. He's been in the United States for 12 years.

20            He does live here with his wife and daughter in

21   Woodmere in a rental property apparently.  I understand now

22   from the information provided today that his wife is also

23   expecting their second child.  He's self employed in a real

24   estate company where he claims to earn $36,000 annually.

25   That's certainly something I want to hear more about in any

1  consideration of bail.   This man has an obvious gambling

2  problem from what's been set forth in the pretrial services

3  order.   However I also see that he's been seeing a mental

4  health professional for almost two years now.  And that he has

5  no history of substance abuse.

6        He is facing some extremely serious charges here.

7  And clearly the Government's case is very strong.   The

8  defendant's own sworn affidavit acknowledges his wrongdoing in

9  this case.   On the other hand I also note that this is not a

10  crime of violence.

11        I also understand from the information provided today

12  by defense counsel that the defendant has signed a confession

13  of judgment.   It is some period of time having elapsed with

14  regard to these specific allegations.   And so it's a close

15  question here, frankly, whether he is a flight risk.   Which

16  then leads to the question, are there any conditions or series

17  of conditions that could insure his return to court.

18        I believe that there are.   However, I haven't heard

19  anything yet by way of a proffer that's sufficient under these

20  circumstances with regard to the amount of a bail package

21  sufficient to alleviate the concerns that I have and that have

22  also been expressed by the Government.

23        There are any number of conditions that would be

24  warranted here, including home detention.   Given the amount

25  that's at stake here with regard to the loss incurred, and the

1  nature of the charges themselves, again I've mentioned he has

2  tied outside the country.  I have concerns about any available

3  funds that he may have overseas and that something else would

4  have to be addressed in any bail package as well.  And I'd also

5  need to know more about what he actually does day to day for a

6  living and how that impacts the nature of the crimes that he's

7  charged with.

8           So given what I've heard thus far today, there's no

9  proffer that I feel is sufficient at this time to warrant his

10 release.  However, you were right to come back here with a

11 viable bail package remains open, Mr. Barket.  All right?

12          MR. BARKET:  What is the Court's availability over

13 the next say, -- I'm sorry, one second, Judge.  Tomorrow or

14 next week, starting with Wednesday, being the earliest.

15          THE COURT:  I'm here tomorrow, although I find it, I

16 would be quite amazed that you'd be in a position to bring back

17 the type of package we're talking about by tomorrow morning.

18          MR. BARKET:  That would be ambitious, but --

19          THE COURT:  Well, starting Wednesday of next week,

20 that's what you're talking about?

21          MR. BARKET:  Monday and Tuesday, just there's not

22 going to be any way that his family and friends will be able to

23 --

24          THE COURT:  Well, why don't you give me a time and

25 I'll tell you whether I can do that or not.  I need to know

Colloquy                    14

1  when you're going to be here.

2          MR. BARKET:  Can we say Thursday or Friday then?

3          THE COURT:  What time?

4          MR. BARKET:  Friday morning?

5          THE COURT:  Friday morning, April 5th, that's fine,

6  I'm here all morning.

7          MR. BARKET:  And just one second, Judge.  Sorry,

8  Judge, can we leave it on Friday morning at 10 o'clock, and if

9  something happens that, I would ask the Court to advance the

10 case a couple of days.

11         THE COURT:  That's fine.

12         MR. BARKET:  But we'll leave it at Friday morning at

13 10 o'clock.  I'm confident by then we'll be able to have the

14 package together.  If we get lucky and get it done earlier,

15 we'll contact the Court and Mr. Caffarone.

16         THE COURT:  That's fine, and just so there's no

17 misunderstanding here, the bail is going to be set in at least

18 the sum of a million dollars.  And that has to be fully

19 secured.  All right?

20         MR. BARKET:  I understood that.

21         THE COURT:  All right.  The record will reflect the

22 fact that I've completed the order of detention pending trial.

23 This case is put over to next Friday at 10, unless I hear

24 something to recommence sooner from defendant's counsel.  And

25 Mr. Barket, just again, because I don't want there to be any

Colloquy                                          15

1  misunderstandings here.  There are any number of issues that

2  have to be addressed here other than simply achieving a million

3  dollars in a secured amount.  I brought up the issue of any

4  bank accounts or monies that are held overseas.  I have

5  questions about what his work environment is and what he

6  actually does day to day.  Those are things that are all going

7  to have to be addressed here before this thing is resolved.

8  All right?

9          MR. BARKET:  I understand that, Judge, and I did note

10 the concerns you had as you were going through them.  Can we in

11 some way mark the commitment slip, if that's the right phrase,

12 the detention order, that he, for religious observance for

13 Passover for him?  Because there are significant dietary

14 restrictions over the next several days.

15         THE COURT:  All right.  I'm happy to, and even do it

16 this evening, if you want to give me a draft order for the jail

17 I'll take care of it right away.  If you want to wait for a

18 minute, we'll give you an email address to send it to here so

19 it can be taken care of it immediately.

20         MR. BARKET:   If you can, and I don't want to keep

21 the Court, because I know it's a, as I said it's a holiday for

22 everybody this week. I'll have somebody in my office do that

23 before I get back so you'll hopefully have something in a half

24 an hour or so.

25         THE COURT:  That's fine.  All right.  Is there

Colloquy                                    16

1   anything further from the Government?

2            MR. CAFFARONE:  The issue of a preliminary hearing

3   was, I'm not sure that he's agreeing to waive that.

4            THE COURT:  Yes.  I have a form that was handed up,

5   indicating that the defendant is waiving his right to a

6   preliminary hearing.  Let me just confirm that on the record,

7   Mr. Barket.

8            MR. BARKET:  I'm sorry, Judge?

9            THE COURT:  I have a form --

10           MR. BARKET:  We did waive the preliminary hearing.

11           THE COURT:  That's fine.  Just want to note that for

12  the record.  All right.  Anything else?

13           MR. CAFFARONE:  No, Your Honor, thank you.

14           THE COURT:  Anything else, Mr. Barket?

15           MR. BARKET:  No, Judge, thank you.

16           THE COURT:  All right, thank you all, we're

17  concluded.

18                    *          *          *

19

20

21

22

23

24

25

1        **C E R T I F I C A T I O N**

2             I, **PATRICIA POOLE**, court approved transcriber,

3   certify that the foregoing is a correct transcript from the

4   official electronic sound recording of the proceedings in the

5   above-entitled matter., and to the best of my ability.

6

7

8   _____

9   /S/ PATRICIA POOLE

10  TERRY GRIBBEN'S TRANSCRIPTION SERVICE DATE:  _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25