```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA,      . Case No. 13-CR-00362
                               .
          vs.                  .
                               . 824 Federal Plaza
GERSHON BARKANY,               . Central Islip, NY
                               .
             Defendant.        .  June 26, 2013
. . . . . . . . . . . . . . . .
```

                    TRANSCRIPT OF PLEA HEARING
                 BEFORE HONORABLE ARLENE R. LINDSAY
                    UNITED STATES DISTRICT JUDGE


APPEARANCES:


For The Government          UNITED STATES ATTORNEYS OFFICE
                            EASTERN DISTRICT OF NEW YORK
                            BY: CHRISTOPHER C. CAFFARONE, ESQ
                            610 Federal Plaza
                            Central Islip, NY  11722


For The Defendant:          BARKET MARION EPSTEIN & KEARON, LLP
                            BY: BRUCE BARKET, ESQ.
                            666 Old Country Road, Suite 700
                            Garden City, New York


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

---

**TERRY GRIBBEN'S TRANSCRIPTION SERVICE**
**27 Beach Road, Unit 4**
**Monmouth Beach, NJ  07750**
**(732) 263-0044     Fax No. 732-263-0075**
**800 603-6212**
**www.tgribbentranscription.com**

1                              I N D E X

2

3       WITNESS                                COURT

4

5       GERSHON BARKANY                         39

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Colloquy                                    3

1              COURT CLERK: Calling 2013-CR-362, the United States

2      of America against Gershon Barkany.  Please state your

3      appearances.

4              MR. CAFFARONE:  Chris Caffarone for the United

5      States.  Good afternoon Your Honor.

6              THE COURT: Yes, good afternoon.

7              MR. BARKET: Good afternoon Your Honor, Bruce Barket

8      for Mr. Barkany.

9              THE COURT: All right, good afternoon Mr. Barket.

10     So Mr. Caffarone what is the Government's application today?

11             MR. CAFFARONE: Yes, Your Honor.  The defendant and

12     the Government have a joint application to have the

13     defendant's bail modified.  Currently he's on home detention.

14             The modification would change the home detention to

15     a curfew which allows him to be out to work or allows him to

16     be out between the hours of 6:00 a.m. and midnight with an

17     electronic monitoring bracelet that will be triggered if he's

18     not in the residence between the hours I guess of midnight

19     and 6:00 a.m.

20             The other addition was a travel enhancement.  We'd

21     allow him to travel not only in the eastern and southern

22     districts of New York but also the District of New Jersey

23     where his parents reside.

24             And then the final restriction was a restriction to

25     address his gambling problem which he has a history of having

Colloquy                                    4

1   a gambling issue.  We'd ask that Your Honor impose a

2   restriction that he not gamble or enter any gambling

3   establishments.  And this will allow him hopefully to work

4   and potentially repay some of the victims that have not been

5   repaid to date.  So we believe that this is a reasonable

6   condition.  We ask that Your Honor endorse the application.

7           THE COURT: What's the expectation as to where he's

8   going to work?

9           MR. CAFFARONE: He has a number of business deals

10  it's my understanding.  He can address this better.  That

11  don't, they're not done out of the office.  He has to go to

12  business meetings in the city.  He may have to also travel

13  through New Jersey for some of these deals.  I don't know the

14  specifics.

15          THE COURT: Well Mr. Caffarone I'm concerned here.

16  Because one of the, you know, the obvious allegations here

17  that, you know, he engaged in investor fraud to the extent of

18  $60 million.  Is he going to be involved in investments

19  again?

20          MR. CAFFARONE: Your Honor I believe the deals,

21  obviously there is the risk that he go and commit more fraud.

22  I believe that that risk is not great because he's going to

23  be monitored by his attorney.

24          THE COURT: By who?

25          MR. CAFFARONE: By Mr. Barket.  Is going to make

1  sure that this defendant, who's going to plead guilty and

2  going to be facing, he's going to be out on bail.  He's got

3  Judge Wexler who is presiding over his case.  If this

4  defendant goes and while he's on bail commits more fraud, the

5  penalties are going to be severe.  And I think he understands

6  that.  In my meeting with him I think he understood that.

7          I know Mr. Barket is putting this defendant in a

8  position that he hopes to be able to make full restitution or

9  be able to argue to Judge Wexler that he's made great

10 strides.  He's met with the government and agreed to

11 cooperate with us to try to trace money that he took from

12 victims with the hopes that we can get that money back and

13 repay victims.

14         He worked with the first set of victims before the

15 government had even arrested him to try to get them money

16 back.  He voluntarily gave over assets.  He voluntarily gave

17 over some monies.

18         So my hope, obviously I'm not clairvoyant.  But

19 those risks are enormous for him.  If he were to go and

20 commit more fraud while he's out, he's going to be in a very,

21 very bad situation when it comes time to be sentenced before

22 Judge Wexler.

23         And I think that the government feels comfortable

24 taking that risk here, because I believe Mr. Barket is

25 involved.  I believe he's going to insure that that doesn't

Colloquy                                    6

1   happen.  And if it does, there are going to be severe

2   penalties.

3           THE COURT: And how, Mr. Barket how are you going to

4   insure that doesn't happen?  Are you going to obtain reports

5   from your client as to what he's involved in?

6           MR. BARKET: Yes, Your Honor.  Obviously the purpose

7   here is to raise funds, significant funds, to --

8           THE COURT: That's my concern.

9           MR. BARKET:  To repay the investors that lost money

10  when they invested with him in, during the course of the

11  fraud.  So there's going to be a microscope on all of the

12  transactions he's involved in.

13          THE COURT: Who's going to be behind the microscope?

14          MR. BARKET:  Well initially the transactional

15  lawyers that we're going to hire to do the transactional

16  work.  And then my firm, as we deal with the proceeds of

17  this.  Because we're going to be taking the proceeds of the

18  investments or the business deals and transferring them to

19  the government or ultimately to the investors.  None of us --

20          THE COURT: So when you say your firm, are you

21  suggesting that you're going to assume responsibility here

22  for the defendant's transactions.  And at least monitor his

23  transactions in such a way as to assure, insure that there is

24  no additional fraud?  Are you going that far?

25          MR. BARKET: I'm certainly doing those things.  The

1    part of the responsibility, -- there's no -- we spoke about

2    this in putting together this application and whether or not

3    he submit to the government each of the investments or

4    investment activities he was involved in for them to review.

5    Whether they're going to submit it to us.

6           And the resolution was that we would be, my firm

7    would be looking at the transactions to make sure that they

8    were not fraudulent in the second instance.

9           THE COURT: And why did the government choose not to

10   get involved in that?

11          MR. CAFFARONE: Well Your Honor --

12          THE COURT: Or is that not a choice?

13          MR. CAFFARONE: No, we were offered that choice.

14   And the government is not going to monitor all his business

15   dealings to determine whether they are fraudulent or not.

16   We're not going to give declaratory judgments, signing off on

17   a deal.

18          I spoke with the FBI agent on the case and we trust

19   the defendant to know the difference between a fraudulent

20   deal, a legitimate deal and a fraudulent one.  We trust Mr.

21   Barket to know the difference between a fraud and not a

22   fraud.

23          This case was pretty straightforward in -- I mean

24   it doesn't take someone with Mr. Haggerty's experience to

25   know whether this was a fraud or not.  He said there were

Colloquy                           8

1   deals.  There were no deals.

2          If Mr. Barket is doing his due diligence which I

3   have no reason to believe he won't, he should be able to

4   realize this is a deal you can do, this is a deal you cannot.

5   But we don't want to --

6          THE COURT: I'm confounded by the Government's

7   position.  You know, if the charge wasn't that this

8   gentleman, Mr. Barkany, had engaged in, you know, in a fraud

9   inducing investors to invest $60 million.  So obviously, you

10  know, he's got the wherewithal to get people of substantial

11  means to make investments with him on virtually nothing.

12         I mean it sounds from my reading of the

13  information, he induced people to invest in deals that didn't

14  exist.  I'm not so sure, I'm having difficulty understanding

15  your application to release him to go do business of a

16  substantial nature.  Because presumably this is meant to cure

17  some of the losses that the victims incurred in this scam

18  that's charged.

19         So send him out there to go and engage in a

20  substantial amount of business without some oversight.  Now I

21  understand Mr. Barket's firm is willing to get involved and

22  do what it can to, or what they can to oversee the thing.

23  But the Government's decision to just take a hand's off

24  approach because you don't want to be involved in monitoring,

25  is confounding to the Court.

1          MR. BARKET: It actually, if I may Judge, it

2    actually in discussing this with the Government, it actually

3    ended up making more sense for us to look at this rather than

4    the government.  Because you wouldn't want to have the

5    Government, you wouldn't want to give Mr. Barkany, if I can

6    phrase this correctly, an added plus having been involved.

7          In other words, you wouldn't want to be able to

8    have him say to the investors or people he's dealing with who

9    are going to know about his history, -- you wouldn't want

10   them to be able to say to them well look, you know that this

11   particular deal is good because the FBI has signed off on it.

12    That  would --

13         THE COURT:  Well I think that overstates the case.

14   I don't think the FBI's going to sign off on anything.

15   Neither is the Government going to sign off on anything.  But

16   what the Government can at least take a look at is to make

17   sure, I mean the prior scam was he got people to invest in

18   real estate deals and he never purchased real estate.  There

19   was no such thing.  It was air.

20         I mean at least the Government would be able to

21   insure we're not engaging in air deals again.

22         MR. BARKET: No, well certainly we'll be able to

23   insure that.  That part is relatively --

24         THE COURT: And are you committed to doing what if

25   you discover that the defendant's involved in further elicit

Colloquy                                10

1    transactions?  What are you, -- what steps is your firm

2    prepared to take?  Have you thought that one through?  Are

3    you going to reveal it to the Government?

4          MR. BARKET: Your Honor, there is a two year history

5    here.  Part of which I don't think is in the complaint, is

6    that the original fraud here for about $56 million was self-

7    disclosed in part by Mr. Barkany to the investors.

8          He then met with them, signed off on a confession

9    of judgment and a number of other things.  And literally

10   worked with them over a couple of years to get back to them

11   somewhere between, depending on the value of the assets,

12   somewhere between $15 and $30 million.

13         Then he was arrested.  He's not been, curiously,

14   prohibited from engaging in business for the last several

15   months by a condition of the bail.  What he has been

16   prohibited from doing is leaving his house with some

17   exceptions.

18         What we're proposing now is to have his travel be

19   increased or unlimited within the three districts that we

20   spoke of.  The condition concerning his ability to work or

21   not is actually not one of the things that we're going to,

22   we're seeking to change because it's not, it wasn't

23   previously prohibited.

24         THE COURT:  Well it wasn't previously prohibited in

25   my opinion because the Court at that time saw that this man

Colloquy                          11

1   was on lock down and under house arrest.  And so his ability

2   to engage in business and meet clients and develop the kind

3   of business that is charged in the information, was going to

4   be really very, very restricted based on the conditions of

5   confinement.

6            MR. BARKET:  And --

7            THE COURT: But now I'm being asked to permit this

8   defendant to have basically freedom, you know, from 6:00 a.m.

9   to 12:00 p.m. which is presumably well beyond the amount of

10  the normal workday schedule.  So he's, so there really isn't

11  much of a restriction.  And to the extent that he's out and

12  about -- and with the specific purpose of putting him out

13  there to engage in business.  Now that's what's going on.

14           And so you've offered to monitor the defendant's

15  activities.  But I want to know, -- okay, you monitor the

16  defendant's activities which gives the Court some assurance

17  that there's been, there's some oversight because the

18  Government doesn't want to get involved with it.

19           But what are you going to do if you discover that

20  the defendant is at it again?  What are you prepared to do?

21           MR. BARKET: Obviously we're not going to

22  participate at all in the, in any such thing.   And within

23  the rules, ethical rules, we'd have to comply with the

24  ethical rules.  We wouldn't be free to breach those in any

25  way.

Colloquy                          12

1          THE COURT:  So you wouldn't be telling the

2    Government there's a problem, right?  And you wouldn't be

3    telling the potential victims there's a problem?

4          MR. BARKET: Well, but there's --

5          THE COURT: Am I correct?

6          MR. BARKET: I don't think that there's a way that

7    we would be able to discover the fraud without, with the

8    fraud being committed.

9          The kind of deals and business investments that he

10   has proposed involve, will involve, -- the transactional

11   lawyers won't be of our firm.  They'll be of much larger

12   firms probably in Manhattan, that will do the transactional

13   work for him.  We'll be monitoring what happens with that.

14   The idea that somehow he would engage in some fraud, flagrant

15   fraud and that I would find out about it, seems, anything is

16   possible.  But it seems --

17         THE COURT: You're right.  It would be more than

18   unwise for him to do that, I understand that.  But we are

19   dealing with a defendant who has done this, okay.  So it's

20   not something outside his character, let's put it that way.

21         Although I'm not trying to assign a specific

22   character to the defendant.  But we now have, I mean very

23   reliable information, probable cause to believe because he

24   hasn't pled guilty yet, but at least probable cause to

25   believe that he's engaged in this kind of fraud.

Colloquy                                    13

1              So when you tell me that you're prepared to

2    monitor, monitoring means nothing unless the monitor has some

3    ability to take action.  And you don't.

4              MR. BARKET: Excuse me for one second.

5              THE COURT: I mean that's a concern I have.  I mean

6    I understand --

7              MR. BARKET: I'm sorry, I just wanted to speak, my

8    client wants to speak to me.

9              THE COURT: Yes, go ahead.

10             (Counsel and client confer)

11             MR. BARKET: Thank you.  Just so the Court is aware

12   of what's going, Mr. Barkany is willing to sign a waiver

13   allowing for the disclosure if we discover fraud in the

14   business dealings.  Frankly and I appreciate that.  It

15   certainly is consistent with what I, if I'd asked him, I'm

16   sure, I would have imagined he would have agreed to that.

17             But my concern with my firm being in some kind of

18   quasi law enforcement role where not only --

19             THE COURT: But you volunteered to do it Mr. Barket.

20             MR. BARKET: If I may Judge.

21             THE COURT: Yes.

22             MR. BARKET: I volunteered, and we've set this up so

23   that we would be, -- because we're going to be involved in

24   the transactions because the money is going to be coming to

25   us.

Colloquy                                14

1              THE COURT: Right.

2              MR. BARKET: To repay the investors.  So I'm going

3     to have to know the source of the money.  I'm obviously going

4     to be dealing with a regular basis with whoever does the

5     transactional work for him.  Some of these things, most of

6     them are rather complicated.  And so I'll know what's going

7     on.

8              THE COURT:  But your knowledge is going to be

9     transmitted to whom, if there's a problem?

10             MR. BARKET:  My knowledge would be secondary to the

11    knowledge of the transactional lawyers who would have to be

12    involved in the fraud as well.

13             THE COURT:  But their job is not to monitor.  Your

14    job is to monitor.

15             MR. BARKET: But the lawyers, it's not as if the

16    lawyers other than the fact that they're monitoring would be

17    free to participate --

18             THE COURT: Mr. Barket I can't accept that.  That

19    package doesn't work for me, okay.  You're telling me that,

20    you proposed something with the Government.  And the proposal

21    is that to the extent that the concern of the Court is that

22    this defendant is going to be released and encouraged to go

23    out and conduct business, business transactions perhaps of

24    the very same type that he's charged with defrauding

25    investors.

1       And I'm not saying he's going to go out and engage

2  in fraud.  I'm not presuming that at all.  But to the extent

3  that the Court had a concern that somebody be looking over

4  the defendant's shoulders or at least examining some of these

5  transactions to make sure that we don't wind up with a whole

6  new crop of victims, you have offered or, you know, made the

7  suggestion that your firm be the monitor to make sure that

8  this doesn't happen again.

9       And the monitor's role, when you say to the Court

10  that I will be a monitor, implies that if you found evidence

11  of some problem, that you would take steps to either advise

12  the Government, inform the Court, put a stop to it, tell the

13  victims, -- whatever that step might be.  But you have,

14  you've indicated to the Court you're not willing to take

15  those steps because of the attorney/client privilege.

16       MR. BARKET: No, I'm --

17       THE COURT: But the monitoring -- let me finish.  So

18  the monitoring role means nothing.  It means that you're the

19  one with the information, but you don't pass it on to

20  anybody.

21       MR. BARKET:  Judge, what I was saying before is

22  that we would only be aware of such a thing secondarily.

23  Because the transactional lawyers --

24       THE COURT: I am not going to rely on lawyers not

25  before me.

1          MR. BARKET: But --

2          THE COURT: If transactional lawyers were to come

3     into this courtroom and say Judge we'll be prepared to take

4     that role, fine.  But you're offering to take the role.

5          MR. BARKET: But --

6          THE COURT: I'm not going down that path so don't

7     even, you can make the argument.

8          MR. BARKET: I'm not making an argument Judge.  All

9     I'm doing is asking, let me complete my thought.

10         THE COURT: I'm not going to presume that lawyers

11    who are not in front of me, -- transactional lawyers, are

12    going to be looking with an eye towards whether or not

13    there's a problem, a fraudulent problem with the –

14         MR. BARKET: Could we have a brief recess Judge?

15         THE COURT: Yes.

16              (Recording paused at 12:08:00)

17              (Recording resumes at 12:24:53)

18         THE COURT: All right, we've had a brief recess.

19    Does anyone want to add anything?

20         MR. CAFFARONE:  Nothing from the Government Your

21    Honor.

22         MR. BARKET: Mr. Barkany is actually insisting that

23    I go forward with what he proposed.  So I'm his attorney and

24    I will do as he's instructed.  Which is, that if our firm

25    becomes aware of fraud, he has authorized and in fact

Colloquy                                    17

1    directed that we disclose it to the U.S. Attorney's Office.

2    And that would be a condition of the package I suppose.

3              THE COURT: All right.  Mr. Caffarone.

4              MR. CAFFARONE:  Well, I have nothing to add if he's

5    -- I don't have any objection to that.

6              THE COURT: All right, so the package would be that

7    the million dollar bond would continue, correct?

8              MR. CAFFARONE: Correct.

9              THE COURT: That the travel would be eastern and

10   southern districts as well as New Jersey.  Now, let me just

11   ask something.  How many times have you appeared before

12   Judge, before other judges to seek a modification of the

13   bail?

14             MR. CAFFARONE: We haven't.  The only requests have

15   been in letters where Mr. Barkany has asked to go to his

16   office or other, or recently when his wife had a child.  But

17   we haven't actually had court appearances.

18             The only time we've had Court was for the initial

19   appearance.  And then there was a waiver that was before

20   Judge Wall.  And then there was a bail package presented to

21   Magistrate Judge Tomlinson.  So there were, I think we've

22   been before the Court three times.

23             THE COURT: All right, now where specifically in New

24   Jersey does the family reside?

25             MR. BARKET: Just north of exit 90.

1           THE COURT: Do you know what district that might be?

2           MR. BARKET: There's one district in New Jersey.

3           THE COURT: There's only one?

4           MR. CAFFARONE: Right.

5           THE COURT: Has the defendant's passport been

6    surrendered already?

7           MR. CAFFARONE: Yes, Your Honor.

8           MR. BARKET: Yes, Your Honor.

9           THE COURT: All right, I'm reviewing the conditions

10   that were entered by the previous judicial officer who heard

11   the application for bail.  And that was Judge Tomlinson.

12          She imposed conditions that the defendant was to

13   undergo a mental health evaluation by a certified mental

14   health provider.  Has that been done?

15          MR. BARKET: Yes, Your Honor.

16          THE COURT: And was the report issued to the Court

17   within 30 days?

18          MR. BARKET: I believe so.  We haven't seen it.  But

19   I believe it was issued.  He did that almost immediately upon

20   being released.

21          THE COURT: Mr. Caffarone?

22          MR. CAFFARONE: (inaudible 12:29:24)

23          THE COURT: I did not see anything in the file.

24   Yes, you are whom?

25          OFFICER BORKE:  Officer Borke (phonetic) from

Colloquy                                    19

1  pretrial services.

2            THE COURT: Okay.

3            OFFICER BORKE: Mr. Barkany did participate in a

4  mental health evaluation with First Light Psychological.

5            THE COURT:  Okay.

6            OFFICER BORKE: I'm just reviewing it here.  And I

7  do know that it was submitted to Judge Tomlinson's chambers.

8            THE COURT: All right.

9            OFFICER BORKE: And that was back --

10           THE COURT: And so a report was issued?

11           OFFICER BORKE: It was.

12           THE COURT: Okay.

13           OFFICER BORKE:  That was back in April.

14           THE COURT:  And let me just ask, the reporting

15  requirement as directed by pretrial services, what was the

16  arrangement with respect to reporting?

17           OFFICER BORKE: (inaudible - not on microphone)

18           THE COURT:  Once a month?

19           OFFICER BORKE: (inaudible)

20           THE COURT: So that reporting requirement is to

21  continue.  And so once a month at pretrial services.  And you

22  will be visiting the defendant at his home once a month.

23           OFFICER BORKE:  Yes, it's (inaudible)

24           THE COURT:  I'm sorry, can you get near the

25  microphone?  I'm having trouble hearing you.

1          OFFICER BORKE:  Sure.  If you would like to add

2     that pretrial is permitted to visit him at his place of

3     employment.  We would do that as well if you wish.

4          THE COURT: Yes, I'm going to add that.

5          OFFICER BORKE: Okay.

6          THE COURT: Do we have a place of employment?

7          OFFICER BORKE: That I do not, I'm not aware of.

8          THE COURT: Is there a placement of employment Mr.

9     Barket?

10          MR. BARKET: We actually closed his office shortly

11     after his arrest and we'll reopen another one.  So we'll give

12     that to them once we're able to do it.

13          THE COURT: All right.

14          MR. BARKET: He hasn't obviously been able to set

15     that up because of the conditions thus far.

16          THE COURT: All right.  So if he sets up an office

17     of employment, he is to report that to pretrial services.

18     And they may randomly visit that office.

19          In addition it seems as though Judge Tomlinson

20     posed the requirement of financial disclosure of bank

21     accounts and financial assets.

22          MR. BARKET: Not all.  The ones, any bank accounts

23     or assets outside the country and there are none.

24          THE COURT: Right.  Has that been done?

25          MR. BARKET: Well there are none, so yes.

1          THE COURT: And I think that's it.  Was there

2    anything else that pretrial services is aware of?

3          OFFICER BORKE: Not that I'm aware of.

4          THE COURT: Okay.

5          MR. CAFFARONE: Your Honor there were properties

6    posted that should remain on the bond as well.

7          THE COURT: Right.  I want to speak to the sureators

8    who are signators to the surety bond, assuming they're the

9    same individuals.  Are they the same people?

10          MR. BARKET: Yes, yes, Your Honor.

11          THE COURT:  And they posted the, as surety, the

12    premises located at 17 Locust Hollow Drive in Muncie, is that

13    right?

14          MR. BARKET: Yes.

15          THE COURT:  And is this property under some kind of

16    a trust?

17          MR. BARKET: Yes.

18          THE COURT: So how can it be pledged as property?

19          MR. BARKET: The trustee is the, Mr. Sklar

20    (phonetic) came in and represented to the Court that he had

21    the authority and the ability to place it as security for a

22    bond.  And we have the four beneficiaries of the trust all

23    sign off on it.

24          THE COURT: All right.  So that was done and are

25    they all here?

Colloquy                                22

1          MR. BARKET:  Well the trustee submitted an

2    affidavit.  One of the beneficiaries is in Baltimore.  We did

3    that by affidavit the first time.  We have another one today.

4          And then there are, the other trustees are here.

5    Excuse me, the other beneficiaries of the trust are here as

6    well as his mother-in-law and father-in-law who also signed

7    off on the bond.

8          THE COURT: And the trustee is present or not

9    present?

10         MR. BARKET: He is not present.

11         THE COURT: All right.  So you have prior

12   representation from the trustee that he had the authority to

13   pledge the property.

14         MR. BARKET: Correct.

15         THE COURT:  You have the beneficiaries of the trust

16   either present or by affidavit?

17         MR. BARKET: Correct.

18         THE COURT: And where is that affidavit?

19         MR. BARKET: That should be with the Court.  I have

20   two here.

21         THE COURT:  Is this a newly signed affidavit?

22         MR. BARKET: There are two new ones.  There are two

23   new ones, -- one from Juda Zellinger (phonetic) who is one of

24   the beneficiaries of the trust who resides in Baltimore.  And

25   the trustee, Daniel Sklar. Sklar.

Colloquy                          23

1        THE COURT: Let me see what you have.  No, these are

2    the old ones.  I don't want the old ones.

3        MR. BARKET: I'm sorry Judge.  The one from Mr.

4    Sklar is an original that we have.

5            (pause in proceedings)

6        THE COURT: And who are the other signators on the

7    bond?  There's a Delma Rosen, Rosenni (phonetic)?  I can't

8    read the handwriting.  Somebody who lives at 14 Sands Point.

9        MR. BARKET: They don't live in Sands Point.  Sands

10   Point Road in Muncie.  They're all here Your Honor.

11       THE COURT: All right.  Come on up and identify

12   yourselves please.  Why don't you stand by the podium.  Any

13   beneficiary that's got an interest in the Zellinger trust or

14   the premises located at 17 Locust Holland Drive in Muncie.

15   All right, could you just give me your names please.

16       MS. ROSENBERG: Deborah Rosenberg.

17       THE COURT: All right.

18       MR. ROSENBERG: Joseph Rosenberg.

19       THE COURT: And what is your connection to the

20   trust?

21       MR. ROSENBERG: She is beneficiary, I am just a

22   (inaudible) I have no connnection to the bond.

23       THE COURT: All right.

24       MS. DANZIGER: Deena Danziger (phonetic) beneficiary

25   to the trust.

1            THE COURT: All right.

2            MR. ZELLINGER: Jonathan Zellinger, beneficiary of

3     the trust.

4            THE COURT: Now did, I have two signatures on this

5     bond, the original bond.  Is that one of you?  Did one or two

6     of you sign the original bond?

7            UNIDENTIFIED SPEAKER:  We all signed it.

8            THE COURT: I only have two signatures here.

9            UNIDENTIFIED SPEAKER:  There should be a second

10    page attached.

11           UNIDENTIFIED SPEAKER:  (inaudible) beneficiaries

12    and the trustee signed for purposes of  (inaudible).

13           THE COURT: And are they here?

14           UNIDENTIFIED SPEAKER:  Yeah, they're here.--

15           THE COURT: Wait a minute.  I have, Danni Keer

16    (phonetic).

17           UNIDENTIFIED SPEAKER:  Yes.

18           THE COURT: Oh, that's Danziger.  Okay, I'm trying

19    to read it off of the signature, that's why it's hard.  Mr.

20    Zellinger who's identified himself.  Mr. Sklar for whom there

21    is  -- and is there a Delmar --

22           UNIDENTIFIED SPEAKER:  Deborah Rosenberg?

23           THE COURT: Oh, that could be it.  Deborah

24    Rosenberg, maybe that's it.  And then one more signature that

25    to me is illegible.  Who would that be?

Colloquy                          25

```
 1              UNIDENTIFIED SPEAKER: That is the one from

 2     Baltimore that you have the affidavit from.

 3              THE COURT: No --

 4              UNIDENTIFIED SPEAKER:  Joseph Rosenberg.

 5              THE COURT: That could be.  And is he here?  Oh, is

 6     that you?  Well let me see if that's your signature.  Show

 7     him this.  That's the other person.  Okay, so we have

 8     everybody represented.

 9              All right.  There's been a large discussion here

10     which you've been present for about the bail package.  And

11     it's of vital interest to you folks to know what the terms of

12     the proposed release is and how they're being modified.

13              As you probably are all aware now, the defendant, I

14     mean he was about to plead guilty to this.  So and in

15     addition there's been a finding of probable cause to believe

16     that he is engaged in a fraud of investors to the tune of

17     some $60 million.

18              So those are the charges.  They're not proven yet.

19     The defendant has the right to go to trial on this.  Although

20     he did indicate yesterday that he might plead guilty.  He

21     hasn't done that yet.  So he is presumed to be innocent as of

22     the moment.

23              But I bring that information to your attention so

24     that you're aware of some of the concerns that the Court had

25     with respect to releasing the defendant.
```

Colloquy                                    26

1      He is and the Government has joined in an

2  application and I'm going to order this, -- he's going to be

3  released on bail.  Now the bail conditions which I intend to

4  set are going to set travel restrictions.  They are going to

5  be the eastern district of New York, the southern district of

6  New York and New Jersey.  Which means that he cannot travel

7  outside of those areas.

8      Let me tell you what they are.  The eastern

9  district means Brooklyn, Long Island, Staten Island, Queens.

10 The southern district is Manhattan, Westchester, White Plains

11 and pretty much that's it.  And the area of New Jersey which

12 is where his other family, his family resides.

13      MR. BARKET: I'm sorry to interrupt Judge.  They all

14 live in Rockland County which I'm fairly certain is part of

15 the southern district.

16      THE COURT: I believe you may be right.  But I don't

17 know how much, if all of Rockland County is.

18      MR. BARKET: I believe its Dutchess, Orange,

19 Rockland and Westchester as well as Manhattan and the Bronx.

20      THE COURT: It gets a little fuzzy when you move

21 upstate as to what's included.  I agree with counsel that

22 portions if not all of Rockland County is included.

23      But what's important for you to know is that that's

24 it.  He can't go to Connecticut.  He can't go to Vermont.  He

25 can't travel any place else, but the areas that are

Colloquy                              27

1   designated for his specific travel.

2          If he's outside of the areas that are designated

3   for his specific travel, he's in violation of his bail which

4   is a problem for you folks.

5          And the reason I'm telling you this is because if

6   the defendant violates any of the conditions of bail, then

7   you're in peril in terms of the assets that you've pledged.

8          The Government has asked and I'm going to, frankly

9   I think I'm going to raise the amount of the bond to $2

10  million.  Because it was a million while he was under house

11  arrest.  I'm now going to raise the sum to $2 million because

12  he's going to be released for the better part of the day,

13  from 6:00 a.m. till 10:00 p.m., not 12:00 as suggested.  If

14  he's doing business, it's more than adequate time within

15  which to engage in business affairs.

16         Now, one of the major concerns the Court had was

17  allowing this bail package to go forward, was what kind of

18  business this defendant would be engaged in as he's released

19  and during his release.

20         If he engages in any kind of elicit, fraudulent,

21  unlawful activity during the course of his release, that

22  would be a serious and material violation of his bail

23  conditions.  I've now arranged it to impose on his own

24  attorney the obligation to report those transactions and any

25  elicit transaction or unlawful, fraudulent or unethical

Colloquy                    28

1    transaction to the Government so that the Government is made

2    immediately aware of the fact that that's going on.  And you

3    folks are going to be the losers.

4              The minute that transgression occurs, the

5    Government will be authorized to move against your property,

6    your assets.  And when I say your property, your assets, when

7    you sign a bond for $2 million, it's not limited to just the

8    property that's in the trust.  Anything you own.  Your

9    personal homes, your bank accounts, your cars, everything is

10   in play.

11             And the Government can seize whatever property is

12   available from any one of you or all of you or one of you,

13   whoever's got the most.  Whatever is the easiest to the tune

14   of $2 million.

15             So I tell you that because you have to have a lot

16   of confidence in the defendant when you sign a bond for $2

17   million.  Because you're putting your personal finances at

18   risk.

19             I'm also requiring as part of this package that he

20   be subjected to random visits by pretrial services at any

21   place of employment that he establishes.  As you've already

22   heard, pretrial services is going to be paying a visit to his

23   home once a month.  He's going to be required to report to

24   pretrial services once a month.  If he doesn't do it, it's a

25   violation of bail.

1            If he doesn't show up to Court, any single day

2       that's set, he's in violation of bail.  And it won't matter

3       if he shows up the next day.  So if he's given a date to

4       appear in Court on the 12th and he doesn't show up until the

5       13th, a warrant will be issued for his arrest.  He will be in

6       violation of bail and you folks will be at risk.

7            And if he's arrested on any federal or state

8       charges while he's out on bond, you folks once again at risk.

9       So all of those triggers exist here and you need to be fully

10      aware of them before you sign off on a bond here.  Do you

11      understand?  Does anyone have a question about this?

12           And the properties, and I'll get to your question

13      in a moment.  The property that is the trust property, the

14      specific property at 17 Locust Holland Drive that's being put

15      up, or Locust Hollow Drive, sorry, may not be compromised in

16      any way.  Meaning it can't, you can't empty out the asset.

17      You can't compromise the value of the asset.  You can't get

18      money against that asset.  That asset remains untouched until

19      this case is over, which could be years.  It could be years.

20           So those are the conditions.  Did you, you had a

21      question.

22           UNIDENTIFIED:  The only question I had is can you

23      confer with (inaudible).

24           THE COURT: Absolutely.  And you should confer with

25      whomever, your spouses, whatever.  Because it is a big

Colloquy                              30

1    undertaking.  And I tell you this just to make sure that

2    you're very clear.  And you don't come back six months from

3    now saying I didn't understand.

4              So if you have questions or concerns, discuss them

5    with counsel or ask me because I'll be happy to clarify

6    whatever you clarification on.

7              MR. CAFFARONE: Your Honor did you also add the no

8    gambling?

9              THE COURT: Yes, there's no gambling.

10             MR. CAFFARONE: Okay, thank you.

11             THE COURT: And that's a very important condition

12   here.  Because as you may or may not be aware, there's an

13   indication that the defendant has a gambling problem.

14             If he so much as steps foot in one of those

15   gambling houses, he's in violation of bail and the

16   Government's coming after you folks.  You're the hook here.

17   That's why you're being asked to sign.  And you better have

18   confidence in this gentleman before you sign otherwise you're

19   putting your finances at risk.  Go ahead.

20                       (pause in proceedings)

21                    (Court hears another matter)

22                 (Recording resumed at 12:56:43)

23             THE COURT:  All right, are we ready to continue on

24   United States versus Barkany?

25             MR. CAFFARONE: Yes.

Colloquy                                              31

1          THE COURT: All right.  Let's have the, I'm going to

2     have a new bond prepared and have the sureators -- are all

3     the Sureators prepared to sign the bond?  Does anybody have

4     any additional questions?

5          All right, I'll let the record reflect they've all

6     nodded their assent, okay.  So bail formally is being set at

7     $2 million with the conditions of release as follows.  Travel

8     restrictions to the eastern and southern district of New York

9     as well as New Jersey.

10         The defendant is, who is presently on house arrest,

11    will be permitted to leave his residence from the hours of

12    6:00 to 10:00 p.m., not 12:00 as proposed by the Government.

13    10:00 p.m. is the cut off.

14         I'm permitting pretrial services to conduct random

15    visits of the home and to continue with the current

16    arrangement which is a visit once a month to his home as well

17    as having the defendant appear at pretrial services once a

18    month.

19         I'm permitting pretrial services to conduct random

20    visits at the place of employment which the defendant is to

21    disclose to the pretrial services once it's established.  I

22    understand he does not currently have an office, but plans to

23    have one.  That office should be disclosed to pretrial

24    services.

25         To the extent that any bank accounts or financial

Colloquy                                32

1    assets are established overseas, there is a continuing duty

2    to disclose any accounts that might meet that definition.

3         While the defendant is on release, its reported to

4    the Court that he intends to engage in business, business

5    transactions I should say.  The nature of which are going to

6    be monitored by defense counsel's firm, Mr. Barket.

7         If it's reported by Mr. Barket that the defendant

8    has agreed to a waiver of his attorney/client privilege to

9    permit Mr. Barket to report to the Court or to the Government

10   that is, not the Court, to the U.S. Attorney's Office any

11   untoward, meaning elicit or illegal or transactions of a

12   questionable nature which might constitute violations of law.

13        And that if there is any change, that is if at any

14   point Mr. Barkany decides that he wants to change his waiver

15   of attorney/client privilege, Mr. Barket is to report that to

16   the Government and to the Court.

17        MR. BARKET: Your Honor, I'm sorry.  You're saying a

18   waiver of the attorney/privilege.  It's a waiver of, he's

19   waiving my, any ethical restraints that I might have in

20   reporting a crime to the Government.

21        THE COURT: But presumably there's also some

22   attorney/client privilege involved there as well.

23        MR. BARKET: Right, right, to the extent that it's

24   necessary, that.  But the broader attorney/client privilege

25   will remain intact.  I'm still representing him on a

Colloquy                          33

1    pending

2              THE COURT: Yes, I understand.

3              MR. BARKET: Okay.

4              THE COURT: But it's limited to the subject matter

5    we discussed which is his ongoing business transactions.  And

6    only to the extent that these business transactions are of,

7    are subject matter or nature that raises questions as to

8    their validity or their legality.  And I want to make sure

9    that it's clear that if there's a question as to the legality

10   of a business transaction, that's what I expect Mr. Barket to

11   report to the Government.

12             MR. BARKET: Yes, Your Honor.

13             THE COURT:  And if for whatever reason the

14   defendant withdraws his permission, you must advise us as

15   well.

16             MR. BARKET: Yes.

17             THE COURT: Okay.  In addition, the Court is advised

18   that the defendant may have a gambling addiction.  I'm

19   continuing the order previously entered that he may not enter

20   a gambling establishment or participate in gambling of any

21   kind during the period of his release.

22             And the usual conditions of bail also apply.  That

23   is, that if he's arrested on any federal or state charges

24   while he's out on bail, then bail will be revoked and a new

25   evaluation will be held as to what is the appropriate bail

1   condition for the defendant, if any.

2            And certainly if he fails to appear in Court on any

3   date that's set, -- a warrant will be issued for his arrest

4   and he will face additional charges of bail jumping, which

5   are separate and independent from the ones he faces today.

6            Now, to review the sureator situation, I've been

7   provided by Mr. Barket with affidavits signed by Juda

8   Zellinger dated June 26th, 2013 as well as an affidavit

9   signed by Daniel Sklar, the trustee, signed June 25th of 2013

10  indicating that they are aware of the modifications, -- not

11  the specific ones because they indicate they were advised

12  that Mr. Barkany would be permitted to leave his home between

13  6:00 and 12:00.  It's actually 6:00 and 10:00.  So I've

14  modified that.

15           And I have, I have expanded the bail sum from a

16  million to two million.  So Mr. Barket, I would appreciate it

17  if you would submit an additional affidavit from each of

18  these individuals indicating that they're aware of the $2

19  million bond.

20               MR. BARKET: Right, correct.  Mr. Sklar is not a --

21               THE COURT: Right, he's --

22               MR. BARKET: He's signing only as a trustee.

23               THE COURT: No need from Mr. Sklar, but I need it

24  from Juda Zellinger.

25               MR. BARKET: Correct.

1          THE COURT: All right.  So I need an updated

2    affidavit from Mr., is it Mr. or Mrs.?

3          MR. BARKET: In Baltimore, Mr. Juda.

4          THE COURT: All right.  And then we have the

5    Sureators who have presented here in Court.  They are, let me

6    see, I wrote their names down; Joseph Rosenberg, Deborah

7    Rosenberg, Deena Danziger and Jonathan Zellinger.

8          All of whom appear to be beneficiaries, except for

9    Mr. Rosenberg, of the trust, the Zellinger trust.  But all of

10   whom have been advised of the risks that are involved with

11   signing off on a $2 million bond and are fully aware that

12   their risk is not limited to the specific trust asset.

13         I understand they're willing to sign the bond.  So

14   we have to present the bond for their signature.

15         I also want to make clear that defendant may not

16   apply for a passport during the pendency of this matter.  I

17   understand he surrendered his passport.

18         MR. CAFFARONE: Your Honor that applies to any

19   country, passport, not just the United States.  But applying

20   for a passport --

21         THE COURT: Right.  He has connections with Canada

22   and Israel.  So he may not obtain passports in those

23   jurisdictions as well, those countries as well.

24                     (pause in proceedings)

25         THE COURT:  Mr. Barkany, I'm going to address you

Colloquy                    36

1  directly because I want to make sure you understand

2  everything that you're required to do under the terms of your

3  release.

4  It starts with the travel restrictions to the eastern and

5  southern district of New York as well as the District of New

6  Jersey.

7          Now I've already outlined the eastern district,

8  Brooklyn, Queens, Long Island, Staten Island.  The southern

9  district being Manhattan, the Bronx, White Plains,

10 Westchester, Rockland County.  To the extent that all of

11 Rockland County, again Mr. Barket will give you a clearer

12 definition of what parts if not all of Rockland County is

13 included.  But southern district is your limitation.  You

14 may not travel outside of those areas without Court

15 permission.

16         You may not go into a gambling establishment or

17 engage in gambling during your release.  You may not apply

18 for a passport in any jurisdiction or country.  You've

19 surrendered the one you already have.

20         And if you haven't already surrendered any passport

21 you may have in another country, you must do so immediately.

22 You are placed under the supervision of pretrial services.

23 They are permitted to random visits.  In addition to which

24 you currently have reporting requirement of once a month in

25 person to pretrial services.  That's to continue.  They may,

Colloquy                              37

1   they will visit your home once a month as they've been doing

2   in the past.  And also are permitted random visits.

3           When it comes to the point where you establish a

4   business, you are to report the location of that business to

5   pretrial services.  They will be permitted random visits to

6   that location.  And they will be permitted to access any

7   financial information related to the operations of that

8   business.

9           You may leave your home between the hours of 6:00

10  and 10:00 p.m. only.  You are to disclose any assets or bank

11  accounts that you may possess that or establish overseas.

12  You are to come to Court on any dates that are set.  If you

13  fail to show up in Court on any date that's set, a warrant

14  will be issued for your arrest and you will be faced with a

15  new charge of bail jumping which is a separate and

16  independent charge from the one you currently face.

17          If you are arrested on any federal or state charges

18  while you are out on bail, that will constitute a violation

19  of your bail.  And the conditions of your release will be

20  reexamined at that time.

21          Your bail has been set at $2 million, secured by

22  the signatures of the various Sureators who have appeared

23  here today as well as the premises at 15 Locust Hollow Drive,

24  Muncie, New York.

25          I think that's -- and most importantly while you

Colloquy                                         38

1   are on release from 6:00 to 10:00 p.m. as we've discussed

2   here in Court and made very clear, to the extent that you

3   engage in business transactions, your attorney, with your

4   permission, which has been represented to the Court you've

5   given, if Mr. Barket is, who is, who has pledged to monitor

6   your activities of a business nature, if he becomes aware of

7   any activities which are of a possible unlawful, fraudulent

8   or unethical nature, you've given him permission to disclose

9   that activity or the nature of that activity to the U.S.

10  Attorney's Office.  Do you understand the conditions of your

11  release?

12          MR. BARKANY: Yes, Your Honor.

13          THE COURT: Do you have any questions about what

14  you're required to do?

15          MR. BARKANY: No.

16          THE COURT: All right.  All right, with respect to

17  Mr. Barkany, is there any other application at this time?

18          MR. CAFFARONE: Not by the Government Your Honor.

19          MR. BARKET: One moment Your Honor.

20                  (pause in proceedings)

21          MR. BARKET: Your Honor.

22          THE COURT: Yes.

23          MR. BARKET: I think at this point we would like to

24  proceed with a plea, if the Court has the time to do that.

25          THE COURT: We'll do it at 2:00 o'clock.

1              MR. CAFFARONE: The Government's available Your

2     Honor.

3              MR. BARKET: I'll make myself available.

4                    (Court hears other matters)

5              (Barkany proceeding resumes at 2:39:00)

6              COURT CLERK: Calling 13-CR-362, the United States

7     of America against Gershon Barkany.  Please state your

8     appearances.

9              MR. CAFFARONE: Chris Caffarone for the United

10    States.  Good afternoon Your Honor.

11             THE COURT: Yes.

12             MR. BARKET: Good afternoon again Your Honor, Bruce

13    Barket for Mr. Barkany.

14             THE COURT: All right.  Mr. Barket, I understand

15    your client wishes to go forward with his plea?

16             MR. BARKET: Yes, Your Honor.

17             THE COURT: So let's swear in the defendant.

18             COURT CLERK: Please rise.  Raise your right hand.

19                  DEFENDANT GERSHON BARKANY SWORN

20    EXAMINATION BY THE COURT:

21    Q    All right, Mr. Barkany first of all, on the stand, that

22    you have the right once again to ask Judge Wexler to take

23    your plea, correct?  You know that?

24    A    Yes.

25    Q    You have that right.  Are you willing nonetheless to let

Barkany-Court                                    40

1    me take your plea?

2    A    Yes.

3    Q    And Judge Wexler being the Judge who would sentence you

4    normally would take a plea, but you're willing to let me do

5    it?

6    A    Yes.

7    Q    All right.  You had completed a form which we reviewed

8    yesterday.  I just want to ask you just generally is there

9    any changes that you wish to make to any of the answers you

10   gave on that form?

11   A    Yes.

12   Q    There is?

13   A    Yes.

14   Q    And what would that change be?

15   A    I was asked if I was promised anything in return for my

16   plea and yesterday I answered yes.  And today I switched my

17   answer to no.

18   Q    Well, I'm going to go through the whole allocution with

19   you.  We need to do that.  But is there any of the written

20   answers that you provided, did you need to change any of the

21   written answers?

22   A    No.

23   Q    Do you want to look at this again?

24   A    No.  No, thank you.

25   Q    All right.  Well we're going to go over it anyway

1   orally, so.  Just tell me how old you are.

2   A    29.

3   Q    And how far did you get in school?

4   A    High school.

5   Q    Okay.  Now are you presently under the care of any

6   doctor or psychiatrist?

7   A    No.

8   Q    Yes?

9   A    No.

10  Q    Okay.  What about medications, pills, alcohol, anything

11  in the last 24 hours?

12  A    No.

13  Q    Are you on any medications or pills of any type

14  regardless of the 24 hour time line?

15  A    No.

16  Q    So you're not taking anything?

17  A    No.

18  Q    Have you ever been hospitalized or treated for narcotics

19  addiction?

20  A    No.

21  Q    Is your mind clear today?

22  A    Yes.

23  Q    And you understand why you're here?

24  A    Yes.

25           THE COURT: Mr. Barket, have you discussed this

Barkany-Court                              42

1    matter with your client?

2              MR. BARKET: Yes, Your Honor.

3              THE COURT: And does he understand the rights he'd

4    be waiving by pleading guilty?

5              MR. BARKET: I believe he does.

6              THE COURT: And is he capable of understanding the

7    nature of these proceedings?

8              MR. BARKET: I believe he is.

9              THE COURT: So in your opinion is he competent to

10   plead at this time?

11             MR. BARKET: I believe yes.

12             THE COURT: All right.

13   BY THE COURT:

14   Q    Mr. Barkany I want to advise you you still have the

15   right to plead not guilty, do you understand that?

16   A    Yes.

17   Q    And if you pled not guilty under the constitution and

18   laws of the United States, you'd be entitled to a speedy and

19   public trial by jury, with the assistance of your attorney to

20   defend you in that case, do you understand that?

21   A    Yes.

22   Q    And at a trial, you'd presumed to be innocent and it

23   would be up to the Government to overcome that presumption

24   and prove you guilty by competent evidence and beyond a

25   reasonable doubt.  And you would not have to prove that

1   you're innocent because you're presumed innocent.  And if the

2   Government failed in its proof, the jury would have a duty to

3   find you not guilty.  Do you understand that?

4   A    Yes.

5   Q    Now, what would happen at a trial is the Government

6   would have to bring its witnesses to testify in your

7   presence.  Your attorney could object to the evidence that

8   the Government offers.  Your attorney would be entitled to

9   cross examine the Government's witnesses.  And your attorney

10  could offer evidence on your behalf.  Do you understand that?

11  A    Yes.

12  Q    Although because you're presumed innocent, you would

13  have absolutely no obligation to present any evidence at all.

14  Do you understand that?

15  A    Yes.

16  Q    If the Government, after offering its evidence failed in

17  its burden to prove your guilt beyond a reasonable doubt, as

18  you know, the jury would have a duty to find you not guilty.

19  You understand that?

20  A    Yes.

21  Q    Now, at a trial you would have the right to testify if

22  you wanted to do that.  But you couldn't be required to

23  testify because you have the right not to incriminate

24  yourself.  That's the constitutional right you possess.  Do

25  you understand that?

Barkany-Court                                    44

1    A     Yes.

2    Q     So if you decided not to testify the Court would

3    instruct the jury that they could not hold that decision

4    against you in their consideration of the verdict of the

5    case.  Do you understand that?

6    A     Yeah, yes.

7    Q     But if you plead guilty and the Court accepts this plea,

8    you'd be giving up the constitutional rights to a trial, the

9    presumption of innocence, the right not to incriminate

10   yourself, these rights that we've discussed.  There'd be no

11   further trial of any kind.  And no right to appeal or

12   collaterally attack at any time the question of whether or

13   not you're guilty.  Do you understand that?

14   A     Yes.

15   Q     And the other aspect of this is as a consequence of an

16   agreement that you have with the Government, which we're

17   going to discuss in a moment, you've also given up your right

18   to appeal the sentence of the Court to the extent that the

19   sentence is 121 months or less, do you remember that?

20   A     Yes.

21   Q     So as a hypothetical, if Judge Wexler sentenced you to

22   121 months in prison, you would have absolutely no right to

23   appeal any component of this case, meaning your guilt or the

24   sentence of the Court.  Do you understand?

25   A     Yes.

1   Q    Do you also understand that if you plead guilty I'm

2   going to be asking you questions about what you did in order

3   to satisfy myself that you are in fact guilty of the crime

4   that you wish to plead guilty to.  And in answering those

5   questions, you'd be giving up your right not to incriminate

6   yourself.  Do you understand that?

7   A    Yes.

8   Q    So are you willing to give up your right to a trial and

9   these other rights that I've just discussed with you?

10  A    Yes.

11  Q    All right.

12         THE COURT: Now, the Government, I'm going to ask

13  once again to outline the plea agreement for the record.

14         MR. CAFFARONE: Yes, Your Honor.  The plea

15  agreement, the defendant will get coverage from the

16  Government.  The Government agrees not to prosecute him for

17  check kiting as well as the wire mail fraud that he committed

18  between January 2007 and March 2013.

19         In addition in exchange as Your Honor noted, he has

20  agreed to an appellate waiver of 121 months.  The defendant

21  also agreed to forfeit, to an entry of money judgment in the

22  amount of $62 million, less any monies or assets that are

23  repaid to victims.  So he agrees to forfeit $62 million.

24  BY THE COURT:

25  Q    All right.  And Mr. Barkany I want to confirm you read

1    the plea agreement, correct?

2    A    Yes.

3    Q    And you reviewed it with your attorney before you signed

4    it?

5    A    Yes.

6    Q    And you understood what the plea agreement provided?

7    A    Yes.

8    Q    Okay.  As we reviewed yesterday, I want to go over the

9    penalties that are associated with the charge you're pleading

10   guilty to which is a charge of mail fraud or a violation of

11   Title 18, United States Code Section 1343, which carries a

12   maximum term of imprisonment of 20 years with a minimum term

13   of imprisonment of zero.  A maximum supervised release term

14   of three years to follow any term of imprisonment.  A maximum

15   fine of $250,000 or twice the gross gain or gross loss from

16   the offense.

17        Restitution, which is in an amount to be determined by

18   the Court.  A $100 mandatory special assessment as well as

19   the criminal forfeiture which the Government has outlined.

20        Now, one of the things we discussed yesterday and I want

21   to go over with you again is the sentencing guidelines.  Your

22   sentencing guidelines as calculated by the Government is an

23   adjusted offense level of 30 which carries a range of

24   imprisonment of 97 to 121 months.  You're aware of that,

25   correct?

1  A    Yes.

2  Q    Now, that's the Government's calculation.  And as I've

3  already explained and I will explain again, just to make sure

4  you're clear, that is the Government's best guess.  That's

5  all it is.  It's a guess.

6       And what will happen is you're going to go to probation

7  and probation is going to do a full and comprehensive review

8  of your background and the circumstances of this case.  And

9  they will do a calculation of the guideline range that

10 applies in your case.

11      It may be the same as the Government's or even your

12 attorney.  I'm not sure what your attorney's told you.  But

13 if your attorney has told you that he agrees with the

14 Government, it's important that you know that probation's

15 going to do their own calculation.  It may be similar to,

16 different from.  All of this information will go to Judge

17 Wexler who will assess everything and make a final conclusion

18 as to what your guideline range is.

19      If Judge Wexler decides that your guideline range is

20 different from what's been estimated by your attorney and the

21 Government, you do not have a basis to withdraw your plea.

22      In other words, don't rely on the Government's estimate

23 or your own attorney's estimate because they're educated

24 guesses at best.  Do you understand that?

25 A    Yes.

Barkany-Court                                                48

1    Q    The one who's going to make a decision about this is

2    Judge Wexler who will review all the information.  And it

3    will be up to Judge Wexler to decide what the sentence will

4    be.  He is not bound by the guidelines.  He could, because he

5    has the authority, decide that the guidelines should pierced,

6    meaning he should go upward beyond what the guidelines

7    provide.

8         Or he could decide that they're too severe and he could

9    sentence you downwardly, meaning less than what the

10   guidelines provide.  Do you understand all that?

11   A    Yes.

12   Q    At the end of the day nobody knows what your sentence is

13   going to be.  So that to the extent that you think you can

14   rely on the estimate provided by the Government or your own,

15   even your own attorney, I'm telling you that you can't

16   because nobody is sure what your ultimate sentence will be

17   and what the guidelines will provide.  Do you understand

18   that?

19   A    Yes.

20   Q    And if your sentence turns out to be more severe than

21   any calculation you've been given or estimate you've been

22   given, that will not provide a basis for withdrawing your

23   plea of guilty.  Do you understand?

24   A    Yes.

25   Q    Now one of the things that I've already told you is the

1   Government has to prove your guilt beyond a reasonable doubt.

2   Here's what they have to prove.  That between December 2007

3   and March 2013, that you knowingly and intently devised a

4   scheme and artifice to defraud investors by means of

5   intentionally false and fraudulent pretenses.  And that you

6   transmitted or caused to be transmitted by wire transfer

7   across state lines, matters that furthered the scheme to

8   defraud.  And that part of this activity was done in the

9   Eastern District of New York.  Do you understand that?

10  A    Yes.

11  Q    So do you understand the charge that you intend to plead

12  guilty to?

13  A    Yes.

14  Q    All right.  And have you discussed that charge with your

15  attorney?

16  A    Yes.

17  Q    Do you have any questions about anything we've discussed

18  up to this point?

19  A    No.

20  Q    Are you ready to enter a plea?

21  A    Yes.

22        THE COURT: Mr. Barket, do you know of any legal

23  reason why the defendant should not be permitted to plead

24  guilty?

25        MR. BARKET: No.

1   Q    Mr. Barkany, are you satisfied with your legal

2   representation up to this point?

3   A    Yes.

4   Q    Then with respect to the information that was filed by

5   the Government charging you with a violation of Title 18

6   United States Code Section 1343, what is your plea?

7   A    Guilty.

8   Q    And are you entering this plea of guilty voluntarily and

9   of your own free will?

10  A    Yes.

11  Q    Has anyone threatened or forced you to plead guilty?

12  A    No.

13  Q    Other than the agreement with the Government which we've

14  described on the record both today and yesterday, has anyone

15  made any promises to cause you to plead guilty?

16  A    No.

17  Q    Has anyone made any promise to you as to what your

18  sentence will be?

19  A    No.

20  Q    So did you as charged in the information.  On or about

21  and between December 2009 and March 2013, those being

22  approximate dates, did you knowingly and intentionally within

23  the Eastern District of New York devise a scheme and artifice

24  to defraud investors and to obtain money and property by

25  means of false and fraudulent pretenses.  And did you use the

1   wire transfers via the Federal Reserve network to execute

2   that scheme to defraud?

3   A    Yes.

4   Q    Those wire transfers being in the amount of

5   approximately $13 million on June 14th, 2010 and another wire

6   transfer in the amount of $500,000 on or about February 15th,

7   2013?  Were those wire transfers transfers that you made or

8   caused to be made in connection with the scheme to defraud?

9   A    Your Honor, I don't recall specific dates or amounts.

10  But I did in fact on at least one occasion engage in a scheme

11  to defraud at least one person out of money in the Eastern

12  District by telling them something that wasn't true and

13  having them send money over the Federal interstate wire

14  system and across through different states.

15  Q    But was it within the time frame that we described?

16  A    Yes, Your Honor.

17  Q    All right.  So I want you to expand and tell me in your

18  own words what it is you did.  How you effected this scheme.

19  A    I told at least one person that I was going to invest

20  their money, but did not use the money as I represented to

21  that person that I would.  Instead I diverted those funds in

22  other directions.

23  Q    Well, what did you tell that person?  How were you going

24  to use that money?

25  A    In one instance I may have represented --

1  Q    You may have or you did?

2  A    I'm sorry.  One instance I would have represented to

3  that investor that I was going to utilize specifically his

4  funds to invest in project X, you know, and describe a

5  transaction to him.  And instead of doing so, I would either

6  have, I would have not used it for that and used it for other

7  things.

8  Q    All right.  Who was this, what was the name of that

9  investor?

10  A    John Doe 1 as known to the Government let's say.

11  Q    Well did you know who the investor was?

12  A    Absolutely, sure.

13  Q    Well who was the investor?

14  A    Can I ask my attorney a question?

15  Q    Sure.

16           (Court and counsel confer)

17           MR. BARKET: Your Honor I think that they were put

18  in as John Doe number 1 and number 2.  They don't want their

19  names identified in a public filing.  The Government knows

20  them.  We know them.  But we'd rather --

21           THE COURT: Well let me hear from the Government.

22  Mr. Caffarone is there any reason at this point for them to

23  remain undisclosed?

24           MR. CAFFARONE: Your Honor the victims are sensitive

25  to their name being disclosed.  Generally, I mean, they have

Barkany-Court                                53

1    asked us not to include their name in Court filings and

2    we've, we've talked to the victims.  And oftentimes we have

3    to talk sometimes to their counsel as well.

4           I think it has to do with the community that

5    they're in.  They're very sensitive to their name being

6    involved in being defrauded.  I don't think its, obviously

7    the U.S. Attorney knows who the victim is.  We've been in

8    contact with the victim.  The defendant knows who the victim

9    is.

10          For purposes of the allocution, I don't think it's

11   a necessary element to it.  And if we can protect the

12   victim's privacy, then I would ask Your Honor to at least to

13   agree to that.

14          THE COURT:  Well, I'd be happy to.

15   BY THE COURT:

16   Q    Well then with respect to John Doe 1, tell me what you

17   did.  I need some specifics.

18   A    On at least one occasion I presented him with a set of

19   information with regards to a deal, telling him that he

20   should invest his money in it.

21   Q    What kind of a deal was it?

22   A    A real estate transaction.

23   Q    All right.  So he gave you thinking or the John Doe gave

24   you money thinking he was investing in real estate, correct?

25   A    John Doe 1 gave me money thinking that that money was

1    going specifically to the real estate deal that I represented

2    to him.

3    Q    All right.  And where did these conversations or where

4    was this real estate located?

5    A    On one occasion the real estate was located in

6    Manhattan.

7    Q    All right.  And where did you engage in these

8    transactions or discussions?

9    A    I was in the Eastern District of New York at the time

10   that I conversed with the, with John Doe 1 about that.

11   Q    All right.  And how much money were you entrusted by

12   John Doe to invest in that real estate deal?

13   A    14.5 million.

14   Q    All right.  And then what did you do with the 14.5

15   million?

16   A    I used it for, I diverted it in other directions than

17   where I represented specifically to John Doe 1 that I was

18   going to be using it for.

19   Q    All right.  So at no point did you use the money, the

20   14.5 million, in accordance with what you were telling John

21   Doe, correct?

22   A    Not all of it.

23   Q    What does that mean?

24        MR. BARKET:  The actual transactions Judge are not

25   simple.  They were, what happened to the money after he

1    received it, it got diverted to a variety of different

2    places.

3              THE COURT:  I understood that.

4    Q    But the simple question I've asked is did you use any

5    portion of the 14.5 towards acquiring the real estate you

6    said you were going to get for John Doe 1?

7    A    No.

8    Q    All right.  And so did you mislead, John Doe, whoever

9    John Doe is, one, did you intentionally deceive him, that

10   party?  It might not have been a him, a he, she?  Did you

11   take the money with the intent to defraud him?

12             (Client and counsel confer)

13             MR. BARKET: I'm sorry Judge, could you repeat the

14   question?

15   Q    Did you take the money, the 14.5 million from John Doe 1

16   with the intent to defraud him?

17   A    As defined under the current federal statutes, yes.

18   Q    Well, I'm not sure that your definition of the current

19   statute is the same as the Court's.  So please tell me when

20   you took the money from Mr. John Doe, you told him you were

21   going to put it into a real estate deal, correct?

22   A    Yes.

23   Q    When you took the money, did you ever intend to put it

24   into that real estate deal?

25   A    On at least one occasion Your Honor I acted with

1  intention to defraud John Doe 1, yes.

2  Q    Well, so not, on one occasion with respect to the 14.5

3  million?

4         MR. BARKET: Your Honor, I'm sorry, the transactions

5  were multiple.  They are complex.  All of the money didn't

6  all, wasn't all diverted in a way that would have been

7  illegal.

8  His intent --

9         THE COURT: Well that's what I'm trying to find out.

10         MR. BARKET: But it's, with all, I don't think it,

11  it is, I think sufficient for the purposes of the  plea

12  allocution --

13         THE COURT: Please don't tell me what's sufficient.

14         MR. BARKET: I'm not telling you what you should

15  accept.  I'm saying what I think.  And in this particular

16  instance, you're asking him general questions about all of

17  the money and the answers, the question doesn't allow for a

18  simple yes or no answer to all of that.

19         THE COURT:  Then Mr., you explain it to me in more

20  specific terms that you're comfortable with.  But to say that

21  I took money from John Doe X and used it for something is

22  insufficient.  So go ahead and tell me in your own words what

23  you did or how this fraudulent transaction occurred.

24         MR. BARKET:  He took --

25         THE COURT: Not you Mr. Barket, your client.  He's

Barkany-Court                                    57

1    pleading guilty.

2              MR. BARKET: He has --

3              THE COURT: I wanted to know what he did.

4              MR. BARKET: Judge and he's explained to you what

5    he's done.  You're asking --

6              THE COURT: In such generic and general terms that I

7    don't understand it.  So I want more specifics.

8              MR. BARKET: We can give you more specifics if you

9    give us a moment.  But he can't --

10             THE COURT: I'd be happy to.

11             MR. BARKET: He can't respond to your questions the

12   way they're being asked in a way --

13             THE COURT: Then you --

14             MR. BARKET: Within the context of this plea because

15   frankly to work out all of these transactions took many

16   hours, many days to figure out where all the money went.

17             THE COURT: Fine.  Then have him explain it in his

18   words.  And if I need some, more information, I'll ask.

19             (Client and counsel confer)

20   BY THE COURT:

21   A    Your Honor.

22   Q    Yes.

23   A    Can I say over again, give an example of a scenario with

24   John Doe 1?

25   Q    Yes, go ahead.  I'd like to hear what you're going to

1    tell me.

2    A     On one occasion I went to John Done 1.  I presented him

3    with a real estate transaction in Manhattan.  At the time I,

4    at some point in time during my conversations with him about

5    this particular transaction, I was in the Eastern District of

6    New York.  I asked him for $7 million to do a real estate

7    transaction, to invest in a real estate transaction.  I

8    specifically gave him the address, the location, et cetera,

9    of that specific real estate deal.

10         My intention while asking him for the money to invest in

11   that specific real estate deal was so that I would use that

12   money elsewhere and not for that real estate deal.

13         As such, it was my intention to defraud him while

14   ultimately of course, I wanted to pay him back.  But I'm

15   saying, I used the money for something different than what I

16   represented to him.

17   Q     Okay.  It's charged in the information as I read it that

18   you told investors that you would use their investment

19   capital to purchase properties in New York and New Jersey

20   that you would subsequently sell for a profit.  Did you say

21   that to both John Doe and John Doe 1 and 2, is that correct?

22   A     Yes.

23   Q     And did you claim that the sellers of those properties

24   would only close on the real estate sales contracts after you

25   had located a purchaser who'd be willing to buy the property

Barkany-Court                                    59

1    at a higher price?

2    A     No.

3    Q     I'm reading right from the information.

4    A     Your Honor the substance of the charge is, I'm just

5    answering the questions truthfully. I am guilty of committing

6    18, 1343, you know.  It's just, it's not exactly how the

7    transaction itself works.  It was a mistake just to how it

8    was exactly written, but it doesn't speak to the substance of

9    the charge.  The deals in fact existed.  The bottom line is

10   though that I made certain representations to investors that

11   were false.

12   Q     All right.

13         THE COURT: Mr. Caffarone what is your evidence

14   here?  Because I'm having a very difficult time eliciting an

15   allocution from the defendant that's satisfactory.

16         MR. CAFFARONE: Yes, Your Honor.  The evidence is

17   that the defendant as stated in the information on a number

18   of occasions, represented to John Doe 1 and John Doe 2 that

19   he was going to take their money and use it for particular

20   real estate investments.  Not just real estate generally,

21   particular addresses.  Told them I'm using your money and I'm

22   going to purchase this property.  And then didn't use it for

23   that purpose.  He sent it to other victims to pay, you know,

24   victims from a prior Ponzi scheme or other investors.  He

25   used it to gamble.  He used it for, to donate to charity.

1           In addition Your Honor, in the course of the fraud,

2    John Doe 2 specifically, he provided them with documents, a

3    purchase agreement that purported to be a purchase agreement

4    between the seller of a property that he said he was

5    purchasing and the victims.

6           That agreement, we've spoken to the seller of the

7    property who said we didn't enter that agreement.  That's not

8    our signature.  Mr. Barkany had contacted us months earlier

9    about the property, but we haven't engaged in any

10   negotiations.  We certainly haven't agreed orally or

11   otherwise to sell him this property.

12          In addition in that fraud, the John Doe number 2,

13   he created an escrow agreement that was supposed to be a

14   third party agreement with the escrow agent that was going to

15   hold the monies until they had closed on the property.  So

16   the third party escrow agent was to insure that the funds

17   only went to their intended purpose which was the purchase of

18   the property.

19          We've contacted that third party escrow agent.

20   They have said they didn't enter into that agreement.  That

21   that agreement was not their signature.  And the monies went

22   into an account that was controlled by the defendant.  The

23   defendant had created a bank account I think it was with TD

24   Bank and put it in the name of the third party escrow agent.

25   That wasn't the third party escrow agent's account, it was

Barkany-Court                                        61

1    the defendant's.

2              I believe during the course of a search warrant, we

3    found some of these fraudulent documents as well in the

4    defendant's office.  In addition to all of that evidence, the

5    defendant back in December --

6              THE COURT: Well hold on.  How many, how many of

7    these real estate deals did you find?

8              MR. CAFFARONE: We found, we talked to at least two

9    of the owners where the owner said this deal was not, we

10   never made a deal to sell this property to Mr. Barkany or any

11   of the victims.

12             THE COURT: Okay.  And how many deals were pitched

13   to both John Doe 1 and 2?

14             THE DEFENDANT: There were a number of deals that

15   were pitched; three to John Doe 1 and yeah, John Doe 2 had

16   other deals unrelated to the monies that we charged in the

17   information.

18             So there were some legitimate deals within, that

19   Mr. Barkany had actually done with some of these, some of

20   these victims.  And there are some that we're just not clear,

21   we hadn't spoken to the purchaser but that are not contained

22   within the --

23             THE COURT: But there were multiple deals with John

24   Doe 1 and John Doe 2 for real estate.

25             MR. CAFFARONE: Yes, correct.

Barkany-Court                                    62

1          THE COURT: Which were just bogus deals, correct?

2          MR. CAFFARONE: Completely shams, yes.

3          THE COURT: All right.

4          MR. CAFFARONE: And Your Honor I was, in addition to

5     that evidence that I laid out, August 2011 the defendant

6     signed an affidavit that was notarized where he admits to

7     defrauding John Doe 1 and the other victims that were part,

8     that also gave him money as part of the, what I call the

9     first set of victims.

10    We didn't include all of them in the information.  We only

11    included John Doe 1.

12          In addition to the 46 and a half million dollars,

13    he got another $8 million from other victims.  And in an

14    affidavit he admits to repeatedly engaging, and I'm quoting,

15    in fraudulent and unauthorized practices and conveyances

16    which victimized the creditors.

17          He employed a variety of means in this fraud

18    including the solicitations of funds for real estate and loan

19    transactions which unbeknownst to plaintiffs were not as

20    represented or all together non-existent.

21          You know, we had laid all this out in the

22    complaints.  So that would be our evidence.  I'm sure we have

23    other evidence as well.  We recovered a number of records

24    from his or from his office that we haven't even had a chance

25    to go through.  But at a minimum that's what we would proven

1   had this case gone to trial or if this case goes to trial.

2   BY THE COURT:

3   Q    So Mr. Barkany did you hear the Government's outline

4   here?

5   A    Yes.

6   Q    I'm having a difficult time understanding why you're not

7   able to allocute in this case.  Did you --

8           THE COURT: No, Mr. Barket I'm not addressing you.

9   I'm addressing your client because it's him who is pleading

10  guilty.  And it's necessary that he outline the fraud that

11  was engaged in.

12          MR. BARKET:  He --

13          THE COURT: And the scope of the fraud.

14          MR. BARKET: He has Your Honor.

15          THE COURT: He has not to the Court's satisfaction.

16  So if we're done, we're done.  Are we done?

17          MR. BARKET: You can ask more questions if you like

18  Judge.  He's happy to answer them truthfully as he has so

19  far.

20  BY THE COURT:

21  Q    I want the defendant and I'm going to give you your last

22  chance because after this I'm not going to try it again.  I'm

23  not, I don't want to be pulling teeth.  If you're not willing

24  to plead guilty to the contures of the offense, so be it.

25          You're either to describe what you did or I'm leaving.

1   So what did you do?  I don't want, you know, it's not enough

2   to say well I, whatever you said thus far is insufficient.

3       This is a fairly large scheme to defraud.  You haven't

4   really allocuted to a fairly large scheme to defraud.  So,

5   please, if you want to say something to the Court, you should

6   do it right now.

7               (Client and counsel confer)

8   A    Okay.  Your Honor may I?

9   Q    Yes, go ahead.

10  A    Much of what the United States, what Mr. Caffarone said

11  in open court just now is accurate and is what happened

12  unfortunately.  I, like he also mentioned, there's been, you

13  know, a tremendous amount of deals that went on between my

14  investors and myself, -- some of which were completely

15  legitimate.  And unfortunately many of them as well that were

16  vehicles under which I used to separate money from my

17  investors.  And --

18  Q    When you say separate money, -- do you mean steal money?

19  Because that's what I want to hear, if that's what --

20  A    Yes, I'm actually -- I was just quoting from that thing.

21  From that paper that he read from.

22  Q    Okay, well don't use euphoniums.  Separate from my

23  investors is not the same as admitting that stole money from

24  them.

25  A    Your Honor the truth is I'm not an attorney.  But what I

Barkany-Court                                    65

1   am here to do today and with, very difficult to do it because

2   of, you know, I've been doing this for quite a few years.

3        I am guilty of violating this, this thing that I'm

4   charged with.

5   Q    You see it is, what you're not understanding is that I

6   have to be satisfied that you are guilty, not you.  And so I

7   ask you to tell me, and this is why we do, to tell me the

8   facts.  Tell me the actions that you did so that I can make a

9   finding that you were in fact guilty of the crime you're

10  wishing to plead guilty to.

11       Because ultimately it becomes somewhat of a legal

12  assessment.  And it's the Court's responsibility to insure

13  that you're pleading guilty to a crime you actually

14  committed.

15  A    Okay.

16  Q    That's why we insist on some detail.  And so for you to

17  say I'm guilty is inadequate.  Or that I separated you know

18  money from my investors is inadequate.  Because what's

19  lacking in that is that it's intentional.  That it's done

20  knowingly.  That it was done with the intent to defraud, to

21  steal from your investors.  That you never intended to take

22  the money and put it into the investments you represented you

23  were going to do for them.  And you knew that when you took

24  the money.  Those are the elements that have to be

25  established.

Barkany-Court                                              66

1        And not just for one transaction.  You've got a $60

2   million plus allegation here.  Now, I don't need you to

3   detail all $63 million worth of the transactions.  But

4   certainly you should have enough information at your disposal

5   that you're able to say that large swaths of money were taken

6   from these investors.  And at the moment you took their

7   money, you either lied to them or you knew you weren't going

8   to use it for the purposes that you represented.  Or that you

9   gave them false documents to con them into giving you the

10  money and entrusting you.

11       Those are the elements that have to be allocuted to in

12  order for me to accept this plea.  So all of That has to be

13  folded into this.  Now if you want time to reconsider this,

14  fine.  I'm going to call a recess now and let you think about

15  this so that you can pull it together.

16            MR. BARKET: Judge, there's no thought about whether

17  or not he wants to plead guilty.  He wants to.  The problem

18  arises that you're asking, you asked him specific questions

19  that called for answers --

20            THE COURT:  I'm done.  I'm done.

21            THE DEFENDANT: Your Honor just to answer your

22  question, I do want to speak to my attorney first.

23            THE COURT: If you want ten minutes to get an

24  allocution together, that's fine.  But I have, I gave you the

25  -- I asked questions and then you said okay, well then just.

1    And then I invited you to come and explain it to me.  I'm

2    doing it both ways.  I have never taken so much time with a

3    plea.

4         And never have I been with a defendant who was so

5    unwilling to allocute, okay, to describe the fraud.  You've

6    got a $63 million fraud you're charged with and I can't get

7    any elements out of you.

8         So I'm not sure if it's because you don't want to

9    admit to what you did.  If that's the case, then you

10   shouldn't be pleading guilty.

11        Okay, so take ten minutes.  Talk to your lawyer.

12   Talk to the Government.  You know what I'm looking for.  If

13   you're not able to provide it because it's not true, then

14   don't say it.  If you're not willing to say it because you

15   just prefer not to, then we will void this plea again.

16        But you got to think about what you want to tell

17   the Court.  All right, we'll see you at 3:30.

18              (Recording paused at 3:18:46)

19              (Recording resumed at 3:27:43)

20        THE COURT: All right, we're back on the record.

21   BY THE COURT:

22   Q    Mr. Barkany do you have something you want to describe

23   to the Court?

24   A    Yes.  On or about May 3rd of 2010 I, or just a few days

25   before that, I spoke with John Doe 1.  Presented him with a

1    deal at 335 Madison Avenue in New York City.  At the time

2    that, most of the time that I was discussing with him that

3    deal I was in the Eastern District of New York.

4        That deal I told him I was going to be contract on and

5    attempting to assign it to a third party for a profit.  I

6    told him that for a specific of time, there will be a due

7    diligence period under which our deposit that we'd be handing

8    to seller would be fully refundable.  In the event that we

9    decided not to proceed with the transaction we will be able

10   to get back our money.  There's no risk to us here except for

11   the time loss and having the money to available elsewhere.

12       I made representations to him that I'll be entering into

13   a contract to purchase the property.  That the money will be

14   held by a third party escrow agent or an attorney

15   representing the seller perhaps.  And I told him that at all

16   times his money will be safe and secure.

17       My intention while telling him this was to induce him to

18   give me that 7 million, to give me money.  My intention while

19   telling him this was two fold.  One was ultimately maybe to

20   give him back the money.  But at the time that I was telling

21   it to him, I knowingly told him to give me that money while

22   knowing that for that specific deal I was not going to put

23   the money into that deal.

24       And there's no way he would give me necessarily that

25   money just by telling him that I wanted to use it elsewhere

1    or use it for my own benefit or use it for gambling, or use

2    it to pay back other investors, right.

3         So he gave it to me specifically because of the fact

4    that I told him it was going to be for this deal.  It was

5    going to be under a protected environment, the money, such as

6    an escrow agent or some other kind of fiduciary.

7         Additionally, yeah, I mean, he went into the deal

8    knowing full faith and confidence that his money will be

9    protected.  And there's no way that his money would ever be

10   lost or otherwise not available to be given back to him at

11   the time that he was expecting to originally receive it back.

12        And in fact, subsequent to those conversations with John

13   Doe 1, he wired at my direction $7 million.  And I

14   subsequently completely misappropriated those funds and did

15   not use it for the, and did not use that money for the

16   purposes of why he sent it to me.  And I misrepresented the

17   facts all together as relates to my presentation to him.  And

18   for --

19   Q    And then with respect to John Doe 1 and 2, were there

20   other transactions with those individuals that you did, made

21   representations to those individuals to secure funds from

22   them which at the time you made the representations you knew

23   were false?

24   A    Yes.

25   Q    All right.  And those monies that you obtained under

1   false pretenses from either John Doe 1 or 2, other than the

2   one you described, were those monies wire transferred to you,

3   to your account or to account --

4   A    They were, some were wire transfers, sure.  Some were,

5   for the most part nowadays people do -- yes.

6   Q    Okay.  So some were wire transferred.  But wire

7   transfers were effected, correct?

8   A    Yes, yes.

9   Q    And these conversations with John Doe 1 and 2, did some

10  of those conversations or transactions occur in the Eastern

11  District of New York?

12  A    Yes.

13  Q    And with respect to those other transactions now, did

14  you, that is, did you divert funds to other purposes than

15  what you told them the monies were going to be used for?

16  A    Yes.

17  Q    All right.

18            THE COURT:  Mr. Caffarone we've already gone

19  through the Government's evidence.  I think that with that

20  specificity as to the count and with his admission to the

21  general scheme, I believe there's sufficient information in

22  the allocution, but I'll hear from you.

23            MR. CAFFARONE: I agree Your Honor.  The Government

24  agrees that it satisfies the charged crime.

25            THE COURT: All right.  And it is the basis as I

1    understand it for the $63 million forfeiture, is that right?

2           MR. CAFFARONE: Yes, Your Honor.

3           THE COURT: All right.

4           MR. CAFFARONE: Yes, the $63 million is the monies

5    that John Doe 1, -- the first set of victims, gave to the

6    defendant as the basis --

7           THE COURT: 62 million, I'm sorry.

8    BY THE COURT:

9    Q    And you, I saw a reaction from you Mr. Barkany.  What

10   was the reaction?

11   A    I'm sorry Judge?

12       Q    I don't know.  He, I thought that he took exception

13   to the Government's claim that this scheme that was outlined

14   was the basis for the $62 million forfeiture.

15   A    No, that is the basis for the forfeiture.

16       Q    Okay, that is all I need to know.

17          THE COURT:  All right, after hearing the

18   defendant's allocution and the Government's evidence, I find

19   that there is a factual basis for the plea.  I find that the

20   defendant has knowingly and voluntarily entered into this

21   plea and fully understands the consequences and rights that

22   he has.  And the consequences of the plea.  And I therefore

23   accept his plea of guilty to the information, and would

24   recommend that Judge Wexler do the same.

25          All right.  I think that should be all.  Is there

Court/plea                                    72

1    anything else from the Government?

2                  MR. CAFFARONE:  No, Your Honor.

3                  THE COURT:  Mr. Berket any other application?

4                  MR. BARKET:  No, just I would like to be present or

5    a member of firm be present when he is interviewed by

6    probation.

7                  THE COURT:  Typically I don't pass that information

8    to probation.  Just make your client is aware, and insists on

9    that when he is called by probation.

10                 I don't have a sentencing date.  That will be

11   provided.  Typically what Judge Wexler does is after he waits

12   for the probation report and sends for a sentencing date.

13                 All right, anything else I have to address.

14                 MR. CAFFARONE:  No, Your Honor, thank you.

15                 MR. BERKET:  No, thank you.

16                 THE COURT:  All right, thank you.

17                        *              *              *

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T I O N**

2

3          I, **TRACY GRIBBEN,** court approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8    _____

9    /S/ TRACY GRIBBEN

10   TERRY GRIBBEN'S TRANSCRIPTION SERVICE DATE:  July 24, 2013

11

12

13

14

15

16

17

18

19

20

21

22

23