FILED
CLERK

9/10/2013

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
----------------------------X
                            :
UNITED STATES OF AMERICA,    :
                            :   13-CR-362 (LDW)
        v.                  :
                            :   June 26, 2013
GERSHON BARKANY,            :
                            :   Central Islip, NY
            Defendant.      :
                            :
----------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
BEFORE THE HONORABLE ARLENE R. LINDSAY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:          LORETTA LYNCH, ESQ.
                             UNITED STATES ATTORNEY
                             BY: CHRISTOPHER CAFFARONE, ESQ.
                             ASSISTANT U.S. ATTORNEY
                             610 Federal Plaza
                             Central Islip, New York


For the Defendant:           BRUCE BARKET, ESQ.



Audio Operator:


Court Transcriber:           ARIA SERVICES, INC.
                             c/o Elizabeth Barron
                             102 Sparrow Ridge Road
                             Carmel, NY 10512
                             (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1              THE CLERK:  Calling 13-CR-362, United States

2    v. Gershon Barkany.

3              Please state your appearances.

4              MR. CAFFARONE:  Chris Caffarone for the

5    United States.  Good afternoon, your Honor.

6              MR. BARKET:  Good afternoon again, your

7    Honor.  Bruce Barket for Mr. Barkany.

8              THE COURT:  Mr. Barket, I understand your

9    client wishes to go forward with his plea?

10             MR. BARKET:  Yes, your Honor.

11             THE COURT:  Swear the defendant.

12             (Defendant is sworn.)

13             THE COURT:  Mr. Barkany, first of all, you

14   understand that you have the right once again to ask

15   Judge Wexler to take your plea.

16             Do you know that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  You have that right.  Are you

19   will, nonetheless, to let me take your plea?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Judge Wexler being the judge who

22   will sentence you normally would take the plea, but

23   you're willing to let me do it?

24             THE DEFENDANT:  Yes.

25             THE COURT:  You had completed a form which

1     we reviewed yesterday.  I just want to ask you, just

2     generally, are there any changes that you wish to make

3     to any of the answers you gave on that form?

4                  THE DEFENDANT:  Yes.

5                  THE COURT:  There is?

6                  THE DEFENDANT:  Yes.

7                  THE COURT:  What would that change be?

8                  THE DEFENDANT:  I was asked if I was

9     promised anything in return for my plea and yesterday,

10     I answered yes.  Today, I switched my answer to no.

11                  THE COURT:  Well, I'm going to go through

12     the whole allocution with you.  We need to do that.

13     But is there any -- of the written answers that you

14     provided, did you need to change any of the written

15     answers?

16                  THE DEFENDANT:  No.

17                  THE COURT:  Do you want to look at this

18     again?

19                  THE DEFENDANT:  No, thank you.

20                  THE COURT:  Well, we're going to go over it

21     anyway, orally.

22                  Just tell me how old you are.

23                  THE DEFENDANT:  28.

24                  THE COURT:  How far did you get in school?

25                  THE DEFENDANT:  High school.

```
1              THE COURT:  Are you presently under the care

2   of any doctor psychiatrist?

3              THE DEFENDANT:  No.

4              THE COURT:  Yes?

5              THE DEFENDANT:  No.

6              THE COURT:  What about medications, pills,

7   alcohol, anything in the last 24 hours?

8              THE DEFENDANT:  No.

9              THE COURT:  Are you on any medications or

10  pills of any type, regardless of the 24-hour period?

11             THE DEFENDANT:  No.

12             THE COURT:  So you're not taking anything.

13             THE DEFENDANT:  No.

14             THE COURT:  Have you ever been hospitalized

15  or treated for narcotics addiction?

16             THE DEFENDANT:  No.

17             THE COURT:  Is your mind clear today?

18             THE DEFENDANT:  Yes.

19             THE COURT:  And you understand why you're

20  here?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Mr. Barket, have you discussed

23  this matter with your client?

24             MR. BARKET:  Yes, your Honor.

25             THE COURT:  Does he understand the rights
```

1   he'd be waiving by pleading guilty?

2   　　　　　MR. BARKET:  I believe he does.

3   　　　　　THE COURT:  Is he capable of understanding

4   the nature of these proceedings?

5   　　　　　MR. BARKET:  I believe he is.

6   　　　　　THE COURT:  In your opinion, is he competent

7   to plead at this time?

8   　　　　　MR. BARKET:  I believe yes.

9   　　　　　THE COURT:  Mr. Barkany, I want to advise

10  you you still have the right to plead not guilty.

11  　　　　　Do you understand that?

12  　　　　　THE DEFENDANT:  Yes.

13  　　　　　THE COURT:  If you pled not guilty, under

14  the Constitution and laws of the United States, you

15  would be entitled to a speedy, public trial by jury,

16  with the assistance of your attorney to defend you in

17  that case.

18  　　　　　Do you understand that?

19  　　　　　THE DEFENDANT:  Yes.

20  　　　　　THE COURT:  At the trial, you would be

21  presumed to be innocent, and it would be up to the

22  government to overcome that presumption and prove you

23  guilty by competent evidence and beyond a reasonable

24  doubt.  You would not have to prove that you were

25  innocent because you are presumed innocent.  If the

1    government failed in its proof, the jury would have a

2    duty to find you not guilty.

3              Do you understand that?

4              THE DEFENDANT:  Yes.

5              THE COURT:  What would happen at a trial is,

6    the government would have to bring its witnesses to

7    testify in your presence.  Your attorney could object

8    to the evidence that the government offers.  Your

9    attorney would be entitled to cross-examine the

10   government's witnesses and your attorney could offer

11   evidence on your behalf.

12             Do you understand that?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Although because you're presumed

15   innocence, you would have absolutely no obligation to

16   present any evidence at all.

17             Do you understand that?

18             THE DEFENDANT:  Yes.

19             THE COURT:  If the government, after

20   offering its evidence, failed in its burden to prove

21   your guilt beyond a reasonable doubt, as you know, the

22   jury would have the duty to find you not guilty.

23             Do you understand that?

24             THE DEFENDANT:  Yes.

25             THE COURT:  At a trial, you would have the

1   right to testify if you wanted to do that, but you

2   couldn't be required to testify because you have the

3   right not to incriminate itself.  That's a

4   constitutional right that you possess.

5           Do you understand that?

6           THE DEFENDANT:  Yes.

7           THE COURT:  So if you decided not to

8   testify, the Court would instruct the jury that they

9   could not hold that decision against you in their

10  consideration of the verdict in the case.

11          Do you understand that?

12          THE DEFENDANT:  Yes.

13          THE COURT:  But you plead guilty and the

14  Court accepts this plea, you'd be giving up the

15  constitutional rights to a trial, the presumption of

16  innocence, the right not to incriminate yourself, the

17  rights that we've discussed.  There would be no further

18  trial of any kind and no right to appeal or

19  collaterally attack at any time the question of whether

20  or not you're guilty.

21          Do you understand that?

22          THE DEFENDANT:  Yes.

23          THE COURT:  And the other aspect of this is,

24  as a consequence of an agreement that you have with the

25  government, which we're going to discuss in a moment,

1   you've also given up the right to appeal the sentence

2   of the Court, to the extent that the sentence is 121

3   months or less.

4               Do you remember that?

5               THE DEFENDANT:  Yes.

6               THE COURT:  So as a hypothetical, if Judge

7   Wexler sentenced you to 120 months in prison, you would

8   have absolutely no right to appeal any component of

9   this case, meaning the verdict of guilt or the sentence

10  of the Court.

11              Do you understand that?

12              THE DEFENDANT:  Yes.

13              THE COURT:  Do you also understand that if

14  you plead guilty, I'm going to be asking you questions

15  about what you did, in order to satisfy myself that you

16  are in fact guilty of the crime that you wish to plead

17  guilty to.  And in answering those questions, you'll be

18  giving up the right not to incriminate yourself.

19              Do you understand that?

20              THE DEFENDANT:  Yes.

21              THE COURT:  Are you willing to give up your

22  right to a trial and these others right that I've just

23  discussed with you?

24              THE DEFENDANT:  Yes.

25              THE COURT:  The government, I'm going to ask

1   once again to outline the plea agreement for the

2   record.

3           MR. CAFFARONE:  Yes, your Honor.  The plea

4   agreement -- the defendant will get coverage from the

5   government.  The government agrees not to prosecute him

6   for check kiting as well as the wire/mail fraud that he

7   committed between January, 2007 and March 2013.  In

8   addition, as your Honor noted, he has agreed to an

9   appellate waiver of 121 months.

10          The defendant also agreed to entry of a

11   money judgment in the amount of 62 million dollars,

12   less any monies or assets that are repaid to the

13   victims, so he agrees to forfeit 62 million dollars.

14          THE COURT:  Mr. Barkany, I want to confirm

15   you read the plea agreement, correct?

16          THE DEFENDANT:  Yes.

17          THE COURT:  And you reviewed it with your

18   attorney before you signed it?

19          THE DEFENDANT:  Yes.

20          THE COURT:  And you understood what the plea

21   agreement provided?

22          THE DEFENDANT:  Yes.

23          THE COURT:  As we reviewed yesterday, I want

24   to go over the penalties that are associated with the

25   charge you're pleading guilty, which his the charge of

1    mail fraud or a violation of Title 18, United States

2    Code Section 1343, which carries a maximum term of

3    imprisonment of twenty years with a minimum term of

4    imprisonment of zero, a maximum supervised release term

5    of three years, to follow any term of imprisonment, a

6    maximum of $250,000 or twice the gross gain or gross

7    loss of the offense, restitution, which is in an amount

8    to be determined by the Court, a $100 mandatory special

9    assessment, as well as the criminal forfeiture which

10   the government has outlined.

11           One of the things we discussed yesterday and

12   I want to go over with you again is the sentencing

13   guidelines.  Your sentence guidelines as calculated by

14   the government is an adjusted offense level of 30,

15   which carries a range of imprisonment of 97 to 121

16   months.

17           You're aware of that, correct?

18           THE DEFENDANT:  Yes.

19           THE COURT:  That's the government's

20   calculation and as I've already explained and will

21   explain again, just to make sure you're clear, that is

22   the government's best guess.  That's all it is.  It's a

23   guess.

24           And what will happen is, you're going to go

25   to Probation and Probation is going to do a full and

1   comprehensive review of your background and the

2   circumstances of this case.  And they will do a

3   calculation of the guideline range that applies in your

4   case.  It may be the same as the government's or even

5   your attorney.  I'm not sure what your attorney has

6   told you but if your attorney has told you that he

7   agrees with the government, it's important that you

8   know that Probation is going to do their own

9   calculation and it may be similar to or different from

10  -- all of this information will go to Judge Wexler, who

11  will assess everything and make the final conclusion as

12  to what your guideline range is.

13          If Judge Wexler decides that your guideline

14  range is different from what's been estimated by your

15  attorney and the government, you do not have a basis to

16  withdraw your plea.  In other words, don't rely on the

17  government's estimate or your own attorney's estate,

18  because they're educated guesses at best.

19          Do you understand that?

20          THE DEFENDANT:  Yes.

21          THE COURT:  The one who is going to make a

22  decision about this is Judge Wexler, who will review

23  all the information, and it will be up to Judge Wexler

24  to decide what the sentence will be.  He's not bound by

25  the guidelines.  He could, because he has the

```
 1   authority, decide that the guidelines should be

 2   pierced, meaning he should go upward beyond what the

 3   guidelines provide, or he could decide that they're too

 4   severe and he could sentence you downwardly, meaning

 5   less than what the guidelines provide.

 6              Do you understand all that?

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  At the end of the day, nobody

 9   knows what your sentence is going to be.  So to the

10   extent that you think you can rely on the estimate

11   provided by the government or even your own attorney,

12   I'm telling you that you can't because nobody is sure

13   what your ultimate sentence will be and what the

14   guidelines will provide.

15              Do you understand that?

16              THE DEFENDANT:  Yes.

17              THE COURT:  And if your sentence turns out

18   to be more severe than any calculation you've been

19   given or estimate you've been given, that will not

20   provide a basis for withdrawing your plea of guilty.

21              Do you understand that?

22              THE DEFENDANT:  Yes.

23              THE COURT:  One of the things that I've

24   already told you is, the government has to prove your

25   guilty beyond a reasonable doubt.  Here's what they
```

```
1    have to prove:  That between December, 2007 and March,

2    2013, that you knowingly and intentionally devised a

3    scheme and artifice to defraud investors by means of

4    intentionally false and fraudulent pretenses, and that

5    you transmitted or caused to be transmitted by wire

6    transfer across state lines matters that furthered the

7    scheme to defraud, and that part of this activity was

8    done in the Eastern District of New York.

9              Do you understand that?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Do you understand the charge

12   that you intend to plead guilty to?

13             THE DEFENDANT:  Yes.

14             THE COURT:  And have you discussed that

15   charge with your attorney?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Do you have any questions about

18   anything that we've discussed up to this point?

19             THE DEFENDANT:  No.

20             THE COURT:  Are you ready to enter a plea?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Mr. Barket, do you know of any

23   legal reason why the defendant should not be permitted

24   to plead guilty?

25             MR. BARKET:  No.
```

1          THE COURT:  Mr. Barkany, are you satisfied

2     with your legal representation up to this point?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Then with respect to the

5     information that was filed by the government, charging

6     you with a violation of Title 18, United States Code

7     Section 1343, what is your plea?

8          THE DEFENDANT:  Guilty.

9          THE COURT:  Are you entering this plea of

10    guilty voluntarily and of your own free will?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Has anyone threatened or forced

13    you to plead guilty?

14         THE DEFENDANT:  No.

15         THE COURT:  Other than the agreement with

16    the government which we described on the record both

17    today and yesterday, has anyone made any promises to

18    cause you to plead guilty?

19         THE DEFENDANT:  No.

20         THE COURT:  Has anyone made any promise to

21    you as to what your sentence will be?

22         THE DEFENDANT:  No.

23         THE COURT:  Did you, as charged in the

24    information, on or about and between December, 2009 and

25    March, 2013, those being approximate dates, did you

1    knowingly and intentionally, within the Eastern

2    District of New York, devise a scheme and artifice to

3    defraud investors and to obtain money and property by

4    means of false and fraudulent pretenses, and did you

5    use wire transfers via the Federal Reserve network, to

6    execute that scheme to defraud?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Those write transfers being in

9    the amount of 13 million dollars on June 14th, 2010, and

10   another wire transfer in the amount of $500,000 on

11   about February 15th, 2013?  Were those wire transfers

12   transfers you made or caused to be made in connection

13   with the scheme to defraud?

14             THE DEFENDANT:  Your Honor, I don't recall

15   specific dates or amounts but I did in fact, on at

16   least one occasion engage in a scheme to defraud at

17   least one person out of money in the Eastern District

18   by telling them something that wasn't true and having

19   them send money over the federal interstate wire system

20   and it crossed through different states.

21             THE COURT:  Was it within the time frame

22   that we described?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  So I want you to expand and tell

25   me in your own words what it is you did, how you

1    effected this scheme.

2              THE DEFENDANT:  I told at least one person

3    that I was going to invest their money but did not use

4    the money as I represented to that person that I would.

5    Instead, I diverted those funds in other directions.

6              THE COURT:  Well, what did you tell that

7    person?  How were you going to use the money?

8              THE DEFENDANT:  In one instance, I may have

9    represented --

10             THE COURT:  You may have or you did?

11             THE DEFENDANT:  I'm sorry.  In one instance,

12   I would have represented to that investor that I was

13   going to utilize specifically his funds to invest in

14   project X.  I would describe a transaction to him and

15   instead of doing so, I would either have -- I would

16   have not used it for that and used it for other things.

17             THE COURT:  What was the name of that

18   investor?

19             THE DEFENDANT:  John Doe 1 as know to the

20   government, let's say.

21             THE COURT:  Did you know who the investor

22   was?

23             THE DEFENDANT:  Absolutely, sure.

24             THE COURT:  Who was the investor?

25             THE DEFENDANT:  Can I ask my attorney a

```
 1   question?

 2              THE COURT:  Sure.

 3              (The defendant is conferring with his

 4   attorney.)

 5              MR. BARKET:  Your Honor, I think that they

 6   were put in as John Doe number 1 and number 2.  They

 7   don't want their names identified in a public filing.

 8   The government knows them, we know them but we'd

 9   rather --

10              THE COURT:  Let me hear from the government.

11              Mr. CAFFARONE, is there any reason at this

12   point for them to remain undisclosed?

13              MR. CAFFARONE:  Your Honor, the victims are

14   sensitive to their name being disclosed.  They have

15   asked us not to include their name in court filings and

16   we've -- we've talked to the victims and, often times,

17   we have to talk sometimes to their counsel as well.  I

18   think it has to do with the community that they're in.

19   They're very sensitive to their name being involved in

20   being defrauded.

21              I don't think it's -- obviously, the U.S.

22   attorney knows who the victim is.  We've been in

23   contact with the victim.  The defendant knows who the

24   victim is.  For purposes of the allocution, I don't

25   think it's a necessary element to it and if we can
```

1  protect the victims' privacy, then I would ask your

2  Honor at least to agree to that.

3          THE COURT:  Well, I'd be happy to -- then

4  with respect to John Doe 1, tell me what you did.  I

5  need some specifics.

6          THE DEFENDANT:  On at least one occasion, I

7  presented him with a set of information with regards to

8  a deal, telling him that he should invest him money in

9  that.

10          THE COURT:  What kind of a deal was it?

11          THE DEFENDANT:  A real estate transaction.

12          THE COURT:  All right.  So he gave you money

13  or John Doe gave you money thinking he was investing in

14  real estate, correct?

15          THE DEFENDANT:  John Doe 1 gave me money

16  thinking that that money was going specifically to the

17  real estate deal that I represented to him.

18          THE COURT:  All right.  And where did these

19  conversations or where was this real estate located?

20          THE DEFENDANT:  On one occasion, the real

21  estate was located in Manhattan.

22          THE COURT:  All right.  Where did you engage

23  in these transactions or discussions?

24          THE DEFENDANT:  I was in the Eastern

25  District of New York at the time that I conversed with

```
 1   John Doe 1 about that.

 2                THE COURT:  All right.  And how much money

 3   were you entrusted by John Doe to invest in that real

 4   estate deal?

 5                THE DEFENDANT:  14.5 million.

 6                THE COURT:  All right.  And then what did

 7   you do with the 14.5 million?

 8                THE DEFENDANT:  I used it for -- I diverted

 9   it in other directions than where I represented

10   specifically to John Doe 1 that I was going to be using

11   it for.

12                THE COURT:  So at no point did you use the

13   money, the 14.5 million, in accordance with what you

14   were telling John Doe, correct?

15                THE DEFENDANT:  Not all of it.

16                THE COURT:  What does that mean?

17                MR. BARKET:  The actual transactions, Judge,

18   are not simple.  What happened to the money after he

19   received it -- it got diverted to a variety of

20   different places.

21                THE COURT:  I understood that.  The simple

22   question I asked is, did you use any portion of the

23   14.5 towards acquiring the real estate you said you

24   were going to get for John Doe 1?

25                THE DEFENDANT:  No.
```

```
1            THE COURT:  Did you mislead him -- John Doe,

2    whoever the John Doe 1 is, did you intentionally

3    deceive him, that party, he or she?  Did you take the

4    money with the intent to defraud him?

5            MR. BARKET:  I'm sorry, Judge, could you

6    repeat the question?

7            THE COURT:  Did you take the money, the 14.5

8    million from John Doe 1 with the intent to defraud him?

9            THE DEFENDANT:  As defined under the current

10   federal statutes, yes.

11           THE COURT:  Well, I'm not sure that your

12   definition of the current statute is the same as the

13   Court's.  So please tell me, when you took the money

14   from John Doe, you told him you were going to put it

15   into a real estate deal, correct?

16           THE DEFENDANT:  Yes.

17           THE COURT:  When you took the money, did you

18   ever intend to put it into that real estate deal?

19           THE DEFENDANT:  On at least one occasion,

20   your Honor, I acted with intention to defraud John Doe

21   1, yes.

22           THE COURT:  On one occasion with respect to

23   the 14.5 million?

24           MR. BARKET:  Your Honor, I'm sorry.  The

25   transactions were multiple, they are complex.  All of
```

1  the money didn't all -- wasn't all diverted in a way

2  that would have been illegal.  His intent --

3          THE COURT:  Well, that's what I'm trying to

4  find out.

5          MR. BARKET:  I don't think it -- it is I

6  think sufficient for the purposes of the plea

7  allocution --

8          THE COURT:  Please don't tell me what's

9  sufficient.

10          MR. BARKET:  I'm not telling you what you

11  should accept, I'm saying what I think.  In this

12  particular instance, you're asking him general

13  questions about all of the money, and the answers --

14  the question doesn't allow for a simple yes or no

15  answer to all of that.

16          THE COURT:  Then you explain it to me in

17  more specific terms that you're comfortable with.  But

18  to say that I took money from John Doe X and used it

19  for something is insufficient.  So go ahead, tell me in

20  your own words what you did or how this fraudulent

21  transaction occurred.

22          MR. BARKET:  He took --

23          THE COURT:  Not you, Mr. Barket, your

24  client.  He's pleading guilty.

25          MR. BARKET:  He has --

```
 1              THE COURT:  I want to know what he did.

 2              MR. BARKET:  Judge, he's explained to you

 3   what he's done.  You're asking --

 4              THE COURT:  In such generic and general

 5   terms that I don't understand it, so I want more

 6   specifics.

 7              MR. BARKET:  We can give you more specifics

 8   if you give us a moment, but he can't respond to your

 9   questions the way they're being asked, in a way --

10   within the context of this plea because, frankly, to

11   work out all of these transactions took many hours,

12   many days to figure out where all the money was.

13              THE COURT:  Then have him explain it in his

14   own words.  And if I need more information, I'll ask.

15              THE DEFENDANT:  Your Honor?

16              THE COURT:  Yes.

17              THE DEFENDANT:  Can I say over again, give

18   an example of a scenario with John Doe 1.

19              THE COURT:  Yes, go ahead.  I'd like to hear

20   what you're going to tell me.

21              THE DEFENDANT:  On one occasion, I went to

22   John Doe 1.  I presented him with a real estate

23   transaction in Manhattan.  At the time that I -- at

24   some point in time during my conversations with him

25   about this particular transaction, I was in the Eastern
```

1    District of New York.  I asked him for 7 million

2    dollars to do a real estate transaction, to invest in a

3    real estate transaction.  I specifically gave him the

4    address, the location, et cetera, of that specific real

5    estate deal.

6            My intention while asking him for the money

7    to invest in that specific real estate deal was so that

8    I would use that money elsewhere and not for that real

9    estate deal.  As such, it was my intention to defraud

10   him while ultimately, of course, I wanted to pay him

11   back.  But I'm saying I used the money for something

12   different than what I represented to him.

13           THE COURT:  Okay.  It's charged in the

14   information, as I read it, that you told investors that

15   you would use their investment capital to purchase

16   properties in New York and New Jersey that you would

17   subsequently sell for a profit.  Did you say that to

18   both John Doe 1 and 2?  Is that correct?

19           THE DEFENDANT:  Yes.

20           THE COURT:  And did you claim that the

21   sellers of those properties would only close on the

22   real estate sales contracts after you had located a

23   purchaser who would be willing to buy the property at a

24   higher price?

25           THE DEFENDANT:  No.

 1          THE COURT:  I'm reading right from the

 2   information.

 3          THE DEFENDANT:  Your Honor, the substance of

 4   the charge -- I'm just answering the questions

 5   truthfully.  I am guilty of committing 18 1343.  It's

 6   just not exactly how the transaction itself works.  It

 7   was a mistake as to how it was exactly written but it

 8   doesn't speak to the substance of the charge.  The

 9   deals in fact existed.  The bottom line is, though,

10   that I made certain representations to investors that

11   were false.

12          THE COURT:  Mr. CAFFARONE, what is your

13   evidence here, because I'm having a very difficult time

14   eliciting an allocution from the defendant that's

15   satisfactory.

16          MR. CAFFARONE:  Yes, your Honor.  The

17   evidence is that the defendant, as stated in the

18   information, on a number of occasions represented to

19   John Doe 1 and John Doe 2 that he was going to take

20   their money and use it for particular real estate

21   investments, not just real estate generally, particular

22   addresses, told them, I'm using your money and I'm

23   going to purchase this property, and then didn't use it

24   for that purpose.  He sent it to other victims to pay

25   victims from a prior Ponzi scheme or other investors.

1    He used it to gamble.  He used it to donate to charity.

2             In addition, your Honor, in the course of

3    the fraud, John Doe 2 specifically -- he provided them

4    with documents, a purchase agreement that purported to

5    be a purchase agreement between the seller of a

6    property that he said he was purchasing and the

7    victims.  That agreement -- we've spoken to the seller

8    of the property and he said, we didn't enter that

9    agreement, that's not our signature.  Mr. Barkany had

10   contacted us months earlier about the property but we

11   haven't engaged in any negotiations.  We certainly

12   haven't agreed, orally or otherwise, to sell him this

13   property.

14            In addition, in that fraud with John Doe 2,

15   he created an escrow agreement that was supposed to be

16   a third party agreement with the escrow agent that was

17   going to hold the monies until they had closed on the

18   property.  So the third party escrow agent was to

19   assure that the funds only went to their intended

20   purpose, which was the purpose of the property.

21            We've contacted that third party escrow

22   agent.  They have said they didn't enter into that

23   agreement, that that agreement was not their signature.

24   The monies went into an account that was controlled by

25   the defendant.  The defendant created a bank account, I

 1   think it was at TD Bank, and put it in the name of the

 2   third party escrow agent.  That wasn't the third party

 3   escrow agent's account, it was the defendant's.  I

 4   believe during the course of a search warrant, we found

 5   some of these fraudulent documents as well, in the

 6   defendant's office.

 7            In addition to all of that evidence, the

 8   defendant, back in December --

 9            THE COURT:  Hold on.  How many of these real

10   estate deals did you find?

11            MR. CAFFARONE:  We found -- we talked to at

12   least two of the owners, where the owner said, this

13   deal is not -- we never made a deal to sell this

14   property to Mr. Barkany or any of the victims.

15            THE COURT:  How many deals were pitched to

16   both John Doe 1 and 2?

17            MR. CAFFARONE:  There were a number of deals

18   that were pitched, three to John Doe 1 and -- John Doe

19   2 had other deals unrelated to the monies that we

20   charged in the information.  So there were some

21   legitimate deals within -- that Mr. Barkany had

22   actually done with some of these victims, and there are

23   some that we're just not clear -- we haven't spoken to

24   the purchaser but that are not contained here in --

25            THE COURT:  But there were multiple deals

1   with John Doe 1 and John Doe 2 for real estate --

2               MR. CAFFARONE:   Correct.

3               THE COURT:   -- which were just bogus deals.

4               MR. CAFFARONE:   Completely shammed, yes.

5   Your Honor, in addition to that evidence that I laid

6   out, in August, 2011, the defendant signed an affidavit

7   that was notarized, where he admits to defrauding John

8   Doe 1 and the other victims that were part -- that also

9   gave him money as part of the -- what I call the first

10  set of victims.  We didn't include all of them in the

11  information, we only included John Doe 1.

12              In addition to the 46.5 million dollars, he

13  got another 8 million dollars from other victims.  In

14  an affidavit, he admits to repeatedly engaging -- and

15  I'm quoting -- "in fraudulent and unauthorized

16  practices and conveyances which victimized the

17  creditors."  He employed a variety of means in this

18  fraud, including the solicitations of funds for real

19  estate and loan transactions which, unbeknownst to

20  plaintiffs, were not as represented or altogether

21  nonexistent.

22              We had laid all this out in the complaint.

23  So that would be our evidence.  I'm sure we would have

24  other evidence as well.  We recovered a number of

25  records from his office that we haven't even had a

1   chance to go through.  But at a minimum, that's what we

2   would have proven, had this case gone to trial or if

3   this case goes to trial.

4            THE COURT:  So, Mr. Barkany, did you hear

5   the government's outline here?

6            THE DEFENDANT:  Yes.

7            THE COURT:  I'm having a difficult time

8   understanding why you're not able to allocute in this

9   case.  Did you --

10           No, Mr. Barket, I'm not addressing you.  I'm

11  addressing your client because it's him who's pleading

12  guilty, and it's necessary that he outline the fraud

13  that was engaged in and the scope of the fraud.

14           MR. BARKET:  He has, your Honor.

15           THE COURT:  He has not to the Court's

16  satisfaction.  So when we're done, we're done.

17           MR. BARKET:  You can ask more questions if

18  you like, Judge.  He's happy to answer them truthfully,

19  as he has so far.

20           THE COURT:  I want the defendant -- and I'm

21  going to give you your last chance because after this,

22  I'm not going to try anymore.  I don't want to be

23  pulling teeth.  If you're not willing to plead guilty

24  to the contours of the offense, so be it.  You're

25  either going to describe what you did or I'm leaving.

1              So what did you do?  I don't want -- you
2    know, it's not enough to say, well, I -- whatever you
3    said thus far was insufficient.  This is a fairly large
4    scheme to defraud.  You haven't really allocuted to a
5    fairly large scheme to defraud.  So please, if you want
6    to say something to the Court, you should do it right
7    now.
8              THE DEFENDANT:  Your Honor, may I?
9              THE COURT:  Yes.
10             THE DEFENDANT:  Much of what Mr. CAFFARONE
11   said in open court just now is accurate and is what
12   happened, unfortunately.  Like he also mentioned,
13   there's been a tremendous amount of deals that went on
14   between my investors and myself, some of which were
15   completely legitimate and, unfortunately, many of them
16   as well that were vehicles under which I used to
17   separate money from my investors.
18             THE COURT:  When you say separate money, do
19   mean you steal money, because that's what I want to
20   hear if that's what happened.
21             THE DEFENDANT:  Yes.  I was just quoting
22   from that thing, from that paper that he read from.
23             THE COURT:  Don't use euphemisms.  Separate
24   from my investors is not the same as admitting that you
25   stole money from them.

1          THE DEFENDANT:  Your Honor, the truth is I'm

2     not an attorney.  But what I am here to do today, and

3     it's very difficult to do it because I've been dealing

4     with this for quite a few years -- I am guilty of

5     violating this thing that I'm charged with.

6          THE COURT:  What you're not understanding is

7     that I have to be satisfied that you are guilty, not

8     you.  So I ask you to tell me -- and this is why we do

9     it -- to tell me the facts, tell me the actions that

10    you did, so that I can make a finding that you are in

11    fact guilty of the crime you're wishing to plead guilty

12    to, because ultimately, it becomes somewhat of a legal

13    assessment and it's the Court's responsibility to

14    insure that you're pleading guilty to a crime you

15    actually committed.

16          THE DEFENDANT:  Okay.

17          THE COURT:  That's why we insist on some

18    detail.  So for you to say, well, I'm guilty isn't

19    adequate, or that I separated money from my investors

20    isn't adequate, because what's lacking in that is that

21    it was intentional, that it was done knowingly, that it

22    was done with the intent to defraud, to steal from your

23    investors, that you never intended to take the money

24    and put it into the investments you represented you

25    were going to do for them, and you knew that when you

1   took the money.  Those are the elements that have to be

2   established, and not just for one transaction.  You've

3   got a sixty-million-dollar-plus allegation here.

4             Now, I don't need you to detail all 63

5   million dollars worth of the transactions, but

6   certainly you should have enough information at your

7   disposal that you're able to say that large swaths of

8   money were taken from these investors and that the

9   moment you took their money, you either lied to them or

10  you knew you weren't going to use it for the purposes

11  that you represented or that you gave them false

12  documents to con them into giving you the money or

13  entrusting it.  Those are the elements that have to be

14  allocuted to in order for me to accept this plea.  So

15  all of that has to be folded into this.

16            Now, if you want time to reconsider this,

17  I'm going to call a recess now and let you think about

18  this, so that you --

19            MR. BARKET:  There's no thought about

20  whether or not he wants to plead guilty.  He wants to.

21  The problem arises that you're asking -- you asked him

22  specific questions that call for answers --

23            THE COURT:  I'm done.

24            THE DEFENDANT:  Your Honor, just to answer

25  your question, I do want to speak to my attorney first.

1          THE COURT:  If you want a few minutes to get

2     an allocution together, that's fine.  I asked questions

3     and then you said okay, well then -- and then I invited

4     you to come and explain it to me.  I'm doing it both

5     ways.  I have never taken so much time with a plea and

6     never have I been with a defendant who is so unwilling

7     to allocute and to describe the fraud.  You've got a

8     63-million-dollar fraud you're charged with, and I

9     can't get any elements out of it.  So I'm not sure if

10    it's because you don't want to admit to what you did.

11    If that's the case, then you shouldn't be pleading

12    guilty, okay?

13          So take ten minutes, talk to your lawyer,

14    talk to the government.  You know what I'm looking for.

15    If you're not able to provide it because it's not true,

16    then don't say it.  If you're not willing to say it

17    birth certificate you just prefer not to, then we'll

18    void this plea again, but you've got to think about

19    what you want to tell the Court.  I'll see you at 3:30.

20          MR. CAFFARONE:  Thank you.

21          (Tape off, tape on)

22          THE COURT:  All right, we're back on the

23    record.

24          Mr. Barkany, do you have something you want

25    to describe to the Court?

1               THE DEFENDANT:  Yes.

2               THE COURT:  Okay.

3               THE DEFENDANT:  On or about May 3rd of 2010

4    or just a few days before that, I spoke with John Doe

5    1, presented him with a deal at 335 Madison Avenue in

6    New York City.  At the time -- most of the time I was

7    discussing with him that deal, I was in the Eastern

8    District of New York.

9               That deal, I told him I was going to be

10   going to contract on and attempting to assign it to a

11   third party for a profit.  I told him that for a

12   specific amount of time, there would be a due diligence

13   period under which our deposit that we would be handing

14   to the fellow would be fully refundable.  In the event

15   that we decided not to proceed with the transaction, we

16   would be able to get back our money and there was no

17   risk to us here, except for the time lost in having the

18   money available to invest elsewhere.

19              I made representations that I would be

20   entering into a contract to purchase the property, that

21   the money would be held by a third party escrow agent

22   or an attorney representing the seller, perhaps, and I

23   told him that at all times, his money would be safe and

24   secure.

25              My intention while telling him this was to

 1   induce him to give me that 7 million -- to give me

 2   money.  My intention while telling him this was

 3   twofold:  One was ultimately maybe to give him back to

 4   the money.  But at the time that I was telling it to

 5   him, I knowingly told him to give me that money while

 6   knowing that that specific deal, I was not going to put

 7   the money into that deal.

 8            There's no way he would have given me

 9   necessarily that money just by telling him that I

10   wanted to use it elsewhere or use it for my own benefit

11   or use it for gambling or use it to pay back other

12   investors, right?  So he gave it to me specifically

13   because of the fact that I told him it was going to be

14   for this deal, that it was going to be under a

15   protected environment, the money, such as an escrow

16   agent or some other kind of fiduciary.

17            Additionally -- yeah, he went into the deal

18   knowing with full faith and confidence that his money

19   would be protected, and there's no way that his money

20   would ever be lost or otherwise not available to be

21   given back to him at the time that he was expecting to

22   originally receive it back.  And in fact, subsequent to

23   those conversations with John Doe 1, he wired, at my

24   direction, 7 million dollars, and I subsequently

25   completely misappropriated those funds.  I did not use

1  that money for the purposes of why he sent it to me,

2  and I misrepresented the facts altogether as relates to

3  my presentation to him.

4        THE COURT:  With respect to John Doe 1 and

5  2, were there other transactions with those individuals

6  that you did -- made representations to those

7  individuals to secure funds from them, which at the

8  time you made the representations, you knew were false?

9        THE DEFENDANT:  Yes.

10        THE COURT:  And those monies that you

11  obtained under false pretenses from either John Doe 1

12  or 2, other than the one you described, were those

13  monies wire transferred to you, to your account, or to

14  an account --

15        THE DEFENDANT:  Some were wire transfers,

16  sure.  For the most part, nowadays, people do -- yes.

17        THE COURT:  Okay.  So some weren't wire

18  transfer but wire transfers were effected, correct?

19        THE DEFENDANT:  Yes.

20        THE COURT:  And these conversations with

21  John Doe 1 and 2, did some of those conversations or

22  transactions occur in the Eastern District of New York?

23        THE DEFENDANT:  Yes.

24        THE COURT:  And with respect to those other

25  transactions, did you divert the funds to other

1   purposes than what you told them the monies were going

2   to be used for.

3                 THE DEFENDANT:  Yes.

4                 THE COURT:  Mr. CAFFARONE, we've already

5   gone into the government's evidence.  I think that with

6   that specificity as to the count and with his admission

7   to the general scheme, I believe there is sufficient

8   information in the allocution, but I'll hear from you.

9                 MR. CAFFARONE:  I agree, your Honor.  The

10  government agrees that it satisfies the charged crime.

11                THE COURT:  And it is the basis, as I

12  understand it, for the 63-million-dollar forfeiture, is

13  that right?

14                MR. CAFFARONE:  Yes, your Honor.

15                THE COURT:  All right.

16                MR. CAFFARONE:  Yes.  The 62 million dollars

17  is the monies that John Doe 1 (ui) gave to the

18  defendant.  That's the basis for --

19                THE COURT:  62 million sorry.

20                MR. CAFFARONE:  Yes.

21                THE COURT:  I saw a reaction form you, Mr.

22  Barkany.  What was the reaction?

23                MR. BARKET:  I'm sorry, Judge?

24                THE COURT:  I don't know.  I thought that he

25  took exception to the government's claim that this

1  scheme that was outlined was the basis for the 62-

2  million-dollar forfeiture.

3           MR. BARKET:  No, that's the basis for the

4  forfeiture.

5           THE COURT:  Okay.  That's all I need.

6           After hearing the defendant's allocution and

7  the government's evidence, I find that there is a

8  basis, a factual basis for the plea.  I find that the

9  defendant has knowingly and voluntarily entered into

10  this plea and that he fully understands the

11  consequences and rights that he has and the

12  consequences of the plea.  I therefore accept his plea

13  of guilty to the information and would recommend that

14  Judge Wexler do the same.

15           I think that should be all.  Is there

16  anything else from the government?

17           MR. CAFFARONE:  No, thank you.

18           THE COURT:  Mr. Barket, any other

19  application?

20           MR. BARKET:  No, just that I would like to

21  be present or a member of my firm be present when he's

22  interviewed by Probation.

23           THE COURT:  All right.  Typically, I don't

24  pass that information on to Probation.  Just make sure

25  your client is aware and insists on that when he's

1    called by Probation.

2              MR. CAFFARONE:  There is a form to fill out.

3    He'll check off the box that he wants to present.

4              THE COURT:  I don't have a sentencing date

5    but it will provided.  Typically, what Judge Wexler is,

6    he waits for the probation report and then he sets a

7    sentencing date.

8              Anything else I have to address?

9              MR. CAFFARONE:  No, your Honor, thank you.

10             MR. BARKET:  No, thank you.

11             THE COURT:  All right, thank you.

12                       * * * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18         I certify that the foregoing is a correct

19   transcript from the electronic sound recording of the

20   proceedings in the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                        September 9, 2013