

**Locke Lord** LLP

Attorneys & Counselors

Three World Financial Center
New York, NY 10281
Telephone: 212-415-8600
Fax: 212-303-2754
www.lockelord.com

Shalom Jacob
Direct Telephone: (212) 415-8618
sjacob@lockelord.com

June 30, 2014

BY ECF:

Judge Leonard D. Wexler
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

Re:   United States of America v. Gershon Barkany, No. 13-cr-00362

Dear Judge Wexler:

I am writing in response to the letters submitted to the Court on June 27, 2014 by the attorneys for Mr. Barkany, Bruce Barket and Michael Jannuzzi (the "Letters"), which we discovered only by checking the docket over the weekend.

Although I have never met or communicated with Mr. Barket (and understand that the same was true of Mr. Katz prior to the letter he sent to the Court on June 27), I together with my partner Allen Wasserman have met with and spoken to Mr. Jannuzzi on several occasions and will explain below some of the various misstatements contained in the Letters. Since the Letters claim that our allegations are baseless, we respectfully offer the Court a glimpse of Mr. Barkany's ongoing fraudulent activities and his efforts to interfere with our clients' efforts to recover their money while conveying the false impression that he is working tirelessly to make restitution.

Mr. Barket's Letter clearly portrays his position - that our clients, the primary victims of Mr. Barkany's crimes - have no standing in this case. Of course, the law is quite to the contrary. Pursuant to subsection (a) of the Crime Victims' Rights Act, 18 U.S.C. § 3771, our clients have the following rights:

>   (1) The right to be reasonably protected from the accused.

Atlanta, Austin, Chicago, Dallas, Hong Kong, Houston, London, Los Angeles, New Orleans, New York, Sacramento, San Francisco, Washington DC

NY:1005193/00001:764569v1

Judge Leonard D. Wexler
June 30, 2014
Page 2

> (2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
>
> (3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.
>
> (4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
>
> (5) The reasonable right to confer with the attorney for the Government in the case.
>
> (6) The right to full and timely restitution as provided in law.
>
> (7) The right to proceedings free from unreasonable delay.
>
> (8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

Moreover, the Crime Victims' Rights Act expressly directs the Court to "ensure that the crime victim is afforded the [above] rights" and to "make every effort to permit the fullest attendance possible by the victim." 18 U.S.C. § 3771(b).

Mr. Barket claims that "congenial negotiations" were taking place, but the fact is that Mr. Barkany has nothing to offer our clients except for the millions of dollars he stole that remain unaccounted for.

The Letters' attempt to attribute our clients' reasoned objection to Mr. Barkany's latest travel request to a "turn for the worse" in these "congenial negotiations" much to their professed surprise thoroughly distorts my own clear communications both with Mr. Barkany and Mr. Jannuzzi from the very first time Mr. Jannuzzi and I met.

In fact, on each occasion that I met Mr. Barkany and Mr. Jannuzzi since the former's arrest, I made absolutely clear to them that our investigation has determined, among other things, that despite the cooperation that Mr. Barkany claims to have provided prior to his arrest, throughout our clients' investigation (which commenced in December 2010 and continues even now), Mr. Barkany:

1. Intentionally concealed critical information including bank accounts (some of which used the addresses of relatives) that had never been disclosed to us or our forensic accountant (whom Mr. Barkany agreed could monitor all of his accounts);

2. Intentionally withheld the true amounts paid to and received from certain of his investors, including his father in law, Joseph Rosenberg, and Mr. Saul Kessler and other parties, thus increasing substantially the millions of missing dollars that have not been accounted for;

Judge Leonard D. Wexler
June 30, 2014
Page 3

3. Withheld approximately $2 million of our clients' stolen funds (as explained below) despite his repeated commitment that he returned all of the cash and securities in his possession when he acknowledged his crimes towards the end of 2010; and

4. Together with Mr. Barket, misrepresented to the Court that Mr. Barkany made $30 million of restitution, a statement that (as explained below) was false at the time it was made and even today remains untrue.

While the Letters seek to portray an open line of discussions between our firm and Mr. Barkany and his counsel, these issues were raised quite directly at each of our meetings and phone calls with Mr. Jannuzzi and Mr. Barkany. These meetings were anything but "congenial."[1]

For example, at our last meeting with Mr. Barkany and Mr. Jannuzzi, we repeated the request we had made on several previous occasions for copies of statements for the bank accounts concealed by Mr. Barkany during the more than two years he claims to have "cooperated" with our investigation. Mr. Barkany became enraged, referred to me as "a liar" and denied the existence of these accounts. We immediately provided him with a list of the account numbers and the names and addresses of his relatives who appear to have allowed him to use their information for some of these accounts - in certain cases even after they learned of his Ponzi scheme. Mr. Barkany has refused to provide us with any of these bank statements or checks. Instead, in what Mr. Jannuzzi refers to as responding to all our requests, Mr. Barkany claims to have arranged for the banks to provide these documents to us at a cost to our clients of about $25,000.

Mr. Jannuzzi also seems to have forgotten about each of the times I advised him, both with and without Mr. Barkany present, of the undisclosed stolen funds we believe Mr. Barkany withheld from our clients. Mr. Barkany became angry each time I raised this issue and Mr. Jannuzzi criticized me for not offering "proof" of these allegations.

In fact, I did immediately provide such "proof." For example, documents turned over to our firm pursuant to a subpoena served on Mr. Rosenberg after Mr. Barkany's arrest show quite clearly that even after Mr. Barkany claimed to have turned over all of his cash and securities to our clients (which funds represented but a small fraction of their losses), in the years 2011 and 2012 Mr. Barkany used Mr. Rosenberg's accounts to move approximately $2 million to various parties including Mr. Kessler.

Mr. Barkany acknowledged what these documents showed but angrily claimed that this was "new money" that he raised shortly after he acknowledged stealing more than $60 million from our clients. To date, neither Mr. Barkany nor his counsel has offered a stitch of evidence that these funds were anything other than our clients' stolen money.

Mr. Jannuzzi scoffs at the notion that Mr. Barkany is a serious flight risk, but his claim that Mr. Barkany's transfers to Israel are limited to only $450,000 transferred to his sister is also false

---

[1] Additionally, Mr. Barkany continues to refuse to answer some of our questions on Fifth Amendment grounds because he has not yet been sentenced.

Judge Leonard D. Wexler
June 30, 2014
Page 4

and he knows that. Aside from the fact that the pleadings filed in our clients' pending action in Israel refer to at least $540,000 to 560,000 (which amount probably does not account for all of the envelopes containing approximately $9,000 in cash which Mr. Barkany acknowledges delivering, and having others deliver, to his relatives in Israel), as Mr. Barkany knows and as we have told Mr. Jannuzzi, Mr. Barkany also transferred the following additional amounts to parties in Israel:

| | |
|---|---:|
| Torah Encounters: | $1,700,000 |
| Yeshivat Haran: | 565,000 |
| Maor Hatorah/Yissachar B'Ohalecha: | 823,000 |
| Yad Eliezer | 240,000 |

Notwithstanding our demands for return of these funds, our clients have not yet received one dollar from any of these parties.

Furthermore, as alluded to in Mr. Katz's letter, our investigation recently turned up what appears to be several million additional dollars that people close to Mr. Barkany used to acquire real estate in Israel in 2011/2012, precisely when Mr. Barkany ran some $2 million through Rosenberg's accounts, to wit:

1. We have been informed that in 2012 a prominent New York rabbi, who claims he lacks sufficient funds to repay more than $5,000 per month of the funds his organization received from Mr. Barkany (a total of somewhere between $690,000 and $1.1 million from our clients' money), acquired several apartments in expensive areas in Jerusalem in addition to the homes owned by him and his family in two other cities in Israel;

2. In 2012, said rabbi (whom Mr. Barkany consulted in connection with at least one of his sham hotel deals) and/or his organization acquired a substantial interest in a hotel in Jerusalem through a Cayman Islands holding company;

3. At the same time, Mr. Saul Kessler, who received hundreds of thousands of dollars from Mr. Barkany during this period through a Rosenberg account (in addition to hundreds of thousands of dollars or even more received prior to Mr. Barkany's acknowledgement of his fraud), also acquired a substantial interest in said Jerusalem hotel through the same Cayman Islands entity;

4. Mr. Barkany directed Mr. Rosenberg to send at least $20,000 to the attorney in Israel representing said rabbi and Mr. Kessler in connection with this hotel transaction;

5. Mr. Barkany had advised me prior to his arrest that he and said rabbi were working on precisely such a hotel deal and referred to this rabbi as having "more clout in the hotel industry than IBM;" and

6. After admitting to his Ponzi scheme but prior to his arrest, Mr. Barkany made at least two or three very short (*i.e.*, weekend or two-day) trips to Israel despite having no reason to do so. When I learned of one of these trips and asked Mr. Barkany what purpose the trip served, his response was that his father wanted him to receive blessings from certain rabbis.

Judge Leonard D. Wexler
June 30, 2014
Page 5

With so much money waiting for him in Israel and a family who readily serves as his bank, Mr. Barkany (who was born in Canada and maintains strong ties there as well) has every incentive to flee.

Mr. Jannuzzi's statements in paragraph 2 of his letter are equally false and contrary to my discussions with Mr. Jannuzzi in which he stated that he understood, and had no objection to, the manner in which we valued the assets received from Mr. Barkany and that he so advised his client. Mr. Jannuzzi's claim that our firm "failed to report approximately $10 million in real estate" turned over by Mr. Barkany is a figment of the imagination of Mr. Barkany and his lawyers.

Indeed, Mr. Jannuzzi recently delivered to us a chart (enclosed) which appears to provide the basis for Mr. Barket's false $30 million restitution representation. Some examples of the extent to which the relevant numbers are inflated are set forth below:

1. Mr. Barkany values the Vineyard Complex, a student dormitory facility in Binghamton, New York, at $4.5 million. However, the facts are as follows: Mr. Barkany's entities sunk approximately $7 million to acquire this property and construct this facility. At the time Mr. Barkany turned this property over to our clients early in 2011, the building had not been completed, the vacancy rate was high, substantial unpaid tax arrearages existed and the party constructing the roof sued us for non-payment. I was advised at the time that the value of the building likely did not exceed $1.5 million. Our clients paid the unpaid taxes, completed the construction, resolved the litigation, hired a top flight managing agent and took many other actions to increase the project's value. Although I am not a real estate expert, I doubt the project's value even today is close to the $4.5 million claimed by Mr. Barkany;

2. Mr. Barkany valuation of an investment in a residential complex located in Killeen, Texas (referred to as LC3 Partners) at $1.34 million is likewise a mystery. Mr. Barkany originally "invested" $700,000 in this project which was turned over to us early in 2011. The manager of the deal has refused to buy out our interest and we remain stuck with this involuntary investment. Although we receive occasional distributions, there is no basis for Mr. Barkany's claim that he has made restitution of almost double our investment; and

3. Mr. Barkany claims $5.7 million "restitution" for returning his acquired interest in 135 West 50th Street, although he invested only about $3.5 million in that project. Although the project generated a nice profit when it was sold close to two years later, our clients incurred substantial risk to get to that point. Their position was the same as a lender who forecloses and is forced to hold a property for an extended period of time. Any eventual "profit" belongs to the lender who assumed all of the risk, not the defaulting party.

Mr. Barkany's exaggeration of his claimed restitution is by no means limited to real estate. For example:

1. Mr. Barkany claims to have returned to our clients a securities account worth over $8.15 million. In fact, the net equity returned to our clients was not more than $6.65 million. Mr. Barkany also neglects to mention that the account he turned over to us contained many high risk, small capitalization securities and was margined in excess of the maximum permissible amount, as a result of which no manager was willing to take over the account for fear that any

Judge Leonard D. Wexler
June 30, 2014
Page 6

market downturn would have entirely wiped it out. Our accountant and one of our clients spent considerable time and incurred serious risk in order to turn the account turned over by Mr. Barkany into one that could be properly managed with an acceptable level of risk;

2. Mr. Barkany claims $280,000 of restitution for an investment known as JRC Keystone. We have never received this investment and understand it to be worthless; and

3. Mr. Barkany claims our clients received $600,000 on repayment of an unauthorized loan made to Gateways. In fact, notwithstanding our efforts to collect this loan, the partial repayments we have received from Gateways since 2010 total approximately $250,000.

Although these are not the only claimed restitution numbers inflated by Mr. Barkany and his attorneys, they demonstrate that the $30 million used by Mr. Barket was easily inflated by at least $8 million. Nor do any of Mr. Barkany's valuations give any credit for the substantial cost of legal, accounting and other advisory services that were and continue to be incurred in order to recover these assets.

Even more egregious is Mr. Barket's statement concerning the $1.2 million of IRS refunds that he takes credit for distributing to "the creditors." These refunds relate directly to funds that Mr. Barkany stole from our clients and turned over to the IRS as estimated tax payments for years 2008 and 2009 even though Mr. Barkany incurred substantial losses for both of these years.

Mr. Barket's Letter fails to acknowledge that (i) in 2012, prior to Mr. Barkany's arrest, Mr. Barkany executed a formal document assigning these refunds to our clients; (ii) our clients spent thousands of dollars dealing with IRS audits in order to demonstrate their entitlement to these refunds and paying for an accountant for Mr. Barkany; (iii) Mr. Barkany agreed in writing and notified the IRS that the refunds should be delivered directly to us but then surreptitiously contacted the IRS and arranged that the refunds be delivered to a post office box in his name in Hewlett, New York; (iv) Mr. Barkany received these refunds and turned them over to Mr. Barket who deposited them into his firm's account despite his knowledge that these funds were our clients' property; and (v) neither Mr. Barkany nor Mr. Barket bothered to notify us that they had taken and deposited our funds which in the case of the first refund of approximately $800,000 we learned of after several weeks when our accountant called the IRS to check on the status of the refund. Mr. Barket refused to turn over these funds until my partner Mr. Wasserman made clear to him that if he did not do so, we would advise the Court and take legal action directly against Mr. Barket. Now Mr. Barkany is seeking credit for returning to us funds that Mr. Barkany stole twice from our clients.

Mr. Barket attributes our clients' position to the collusive involuntary bankruptcy petition filed last week against Mr. Barkany by Rosenberg, Kessler and the casino at which Mr. Barkany lost millions of dollars of our clients' money. None of these parties ever claimed to be a creditor of Mr. Barkany until recently when we commenced legal action against them (which complaints we will be happy to share with the Court). We assume the Court can understand our displeasure that the very parties who assisted Mr. Barkany's activities are now seeking to use bankruptcy to interfere with our investigation, as well as our efforts to recover our clients' funds. But the notion that this event caused us to shift gears and suddenly attack Mr. Barkany is, as we have explained above, utter fiction.

Judge Leonard D. Wexler
June 30, 2014
Page 7

One final point: The Letters seem to make light of Mr. Barkany's harassment of various parties, which I expressly brought to the attention of Mr. Barkany and Mr. Jannuzzi. Many of our clients and some other parties have contacted me at one point or another to complain of such harassment, sometimes by Mr. Barkany directly and sometimes by others who appear to be acting on his behalf. One example involves our client Jonathan Stein, who reported being harassed by Mr. Barkany. Generally, the parties who have been harassed are concerned that dissemination of their names might result in additional harassment and pressure. I can personally appreciate their concerns because I too have been harassed and even threatened by relatives of Mr. Barkany and other parties apparently acting at the behest of the Rosenberg and Barkany families and their lawyers. I expressly brought these facts to the attention of Mr. Jannuzzi and Mr. Barkany who agreed that all such harassment should cease. However, they professed to be unable to convey this request to the appropriate people because they do not have the addresses at which to contact them.

My apologies to the Court for such a lengthy response. However, the many misstatements in the Letters left me with no alternative but to provide the Court with a clear explanation of why the primary victims of Mr. Barkany's Ponzi scheme have such a negative view of Mr. Barkany, his advisors and the prospect that he will be able to legitimately earn any meaningful amounts prior to his sentencing.

Respectfully

*Shalom Jacob by /s/*

Shalom Jacob

Enclosure

cc: Bruce A. Barket, Esq.
Michael Jude Jannuzzi, Esq.
AUSA Christopher Caffarone, Esq.

NY:1005193/00001:764569v1

Draft For Discussion Purposes Only

REVISED DRAFT: 06.06.2014

| | List Of Assets Recovered by Gershon Barkany For The Creditors | Credit/ Value | Contingent/ Principal Invested | Additional Contingent Value ± |
|---|---|---|---|---|
| 1 | Vineyard Complex LLC | $ 4,500,000.00 | $ 2,500,000.00 | $ 2,000,000.00 |
| 2 | Frank Family. Life Insurance | $ 45,000.00 | | |
| 3 | LC3 Partners | $ 1,340,000.00 | | |
| 4 | TD Ameritrade. Net Cash | $ 8,150,000.00 | | |
| 5 | Miscellaneous Loans Assigned | $ 430,000.00 | | |
| 6 | 135 West 50th Street, NY | $ 5,732,480.00 | | |
| 7 | Michele Weiss Loan | $ 75,000.00 | | |
| 8 | 622 + 622 & 628 Jarvis | $ 2,150,000.00 | | |
| 9 | Gateways Org. | $ 600,000.00 | | |
| 10 | Springfield. Nursing home. Schreiber | | $ 94,833.00 | |
| 11 | 250 Main Street, New Jersey | $ 248,000.00 | | |
| 12 | Blue Ribbon/ Robert D'annucci Loan | $ 130,000.00 | | |
| 13 | Michael Altman. Net After Schrieber | | $ 150,000.00 | |
| 14 | Barkany Family | $ 268,498.00 | | |
| 15 | Cardis Enterprises | | $ 960,000.00 | $ 15,000,000.00 |
| 16 | Miscellaneous Collections | $ 2,949,225.00 | | |
| 17 | AIQ INC | $ 100,000.00 | $ 100,000.00 | |
| 18 | Alan Proctor | $ 125,000.00 | | |
| 19 | Recoveries From Investors | $ 609,458.00 | | |
| 20 | Morgan 86 Inc. Wire Transfer | $ 107,900.00 | | |
| 21 | Gershon Barkany. HSBC | $ 41,601.00 | | |
| 22 | Gershon Barkany. HSBC | $ 6,101.00 | | |
| 23 | Morgan 86 Inc. Wire Transfer | $ 29,515.00 | | |
| 24 | Prattlenders. Wachovia | $ 6,925.00 | | |
| 25 | One Hudson Park | $ 240,000.00 | | |
| 26 | Full Spectrum, Inc | | $ 1,700,000.00 | $ 25,000,000.00 |
| 27 | SPO Medical | | $ - | |
| 28 | Monies From Barkany Re: Tax Matters | $ 1,233,193.62 | | |
| 29 | LATF | | $ 385,000.00 | $ 2,500,000.00 |
| 30 | CONTINENTAL BANK | $ 682,000.00 | | $ 1,500,000.00 |
| 31 | Beach 13th Street, Far Rockaway | $ 246,000.00 | | |

Draft For Discussion Purposes Only

| # | Description | | Amount | |
|---|---|---|---|---|
| 32 | KIDSWRITE LLC | | $ 185,000.00 | |
| 33 | PICTURE THIS KIDS | | $ 185,000.00 | |
| 34 | SSJ Development. Net after Schreiber | | $ 350,000.00 | Damages |
| 35 | Gershon Barkany. 401k | $ 45,660.00 | | |
| 36 | Anna Zafir/ Life Insurance | $ 68,000.00 | | |
| 37 | JRC KEYSTONE | $ 280,000.00 | | |
| 38 | Credit To Barkany | $ 30,439,556.62 | | |
| 39 | Incoming Creditor Dollars As Of 12/15/2010 | $ 59,505,000.00 | | |
| 40 | Less Credit To Barkany | $ 30,439,556.62 | | |
| 41 | Current Due Amount | $ 29,065,443.38 | | |
| 42 | Interest Accruing from 12/15/2010 Thru 6/15/2014 (42 Months) At 1.0% Interest per annum* | $ 2,109,601.30 | | |
| 43 | Current Due Amount Including Interest | $ 31,175,044.68 | | |
| 44 | June 15,2014 Thru June 15,2019 No Interest Charged On Balances | $ - | | |
| 45 | Amount Due On June 15,2019; | $ | | |
| 46 | Interest Re-Commences On Balance If Any As Of 06.15.2019 @ 3.0% Annum | $ | | |
| 47 | * Interest Computed On Original Incoming Creditor Balance Straight From 12/15/2010 Thru 06/15/2014 | | | |